In the Matter of the Estate of JAMES A. McCAFFERTY, Deceased.

Surrogate's Court, Kings County, April 12, 1933.

*Fitzgerald, Stapleton & Mahon* [*James Regan* and *Thomas J. Kavanagh* of counsel], for the executors.

*Robert M. McCormick*, for Isabel M. Corney, general guardian of Isabel M. McCafferty and others.

*Andrew Eckel*, for the contestants Mary Ferguson and others.

*John H. Schmid*, special guardian for Marie Phyllis Meyer and others.

*Cullen & Dykman*, for Catherine Kitching.

WINGATE, S.  In this executorial accounting thirty-six numbered objections have been interposed on behalf of seven contestants. A reasonably accurate computation by the court indicates that if all were sustained, the resulting surcharge of the accounts of the executors would reach the not inconsiderable total of $1,348,263.63, exclusive of interest.  The trial of the multitudinous issues, many, in themselves, involving large sums, has occupied fourteen full sessions of the court and yielded a somewhat unusually voluminous record.

The decedent died on October 3, 1929.  He was a man of large affairs and substantial property.  A widower at the time of his death, he had had seven children.  Of these, three, James R. McCafferty and Florence Meyer, the accountants, and Catherine Stubbert, survived him; two had predeceased him unmarried and without issue, and two had predeceased, leaving issue.  The children of the last named class are the contestants in this proceeding and comprise the four, of Mary McCafferty Ferguson and the three, of Ambrose T. McCafferty.

Testator's three surviving children appear to have been fully informed during his lifetime of the making and general directions of his will, but on his death no such instrument was found.  It came to light only in December, 1929, being discovered by Mrs. Stubbert in one of decedent's old suits of clothes.

The document, which was dated July 1, 1925, was extremely brief, and after directing the payment of legacies of $3,000 to each grandchild who survived him, gave the entire remainder of his estate in equal shares to his four children, Loretta and James R. McCafferty, Florence Meyer and Catherine Stubbert, appointing all four executors.  Loretta died on February 28, 1928, predeceasing the testator by about nineteen months.

On January 5, 1930, shortly after the finding of the will, Catherine Stubbert died.  This necessitated a delay in its presentation to the court.  Petition for probate was filed on January 22, 1930, and citation was made returnable on February twenty-fifth.  No con-

test developed, but owing to the fact that infants were involved, probate was delayed pending the report of their special guardian, being granted on March 6, 1930. Letters testamentary were issued on the same day.

From the time of the finding of the will, testator's surviving children were under the impression that its legal effect was to vest the remainder of the estate solely in them. Some question on this score having arisen, however, a petition was filed in this court on August 10, 1931, for a judicial construction, which resulted in a determination, rendered on January 6, 1932, that as to the share in the estate bequeathed to the deceased daughter, Loretta, the testator had died intestate. (The opinion of the court on this aspect of the case is reported in 142 Misc. 371.)

An appeal was promptly taken from the resulting decree, which was unanimously affirmed by the Appellate Division (236 App. Div. 678), and the remittitur filed in this court on June 13, 1932.

The practical result of the construction proceeding was the determination that each of the four Ferguson grandchildren is entitled to one-eightieth of the residue of the estate and each of the McCafferty grandchildren to one-sixtieth, the total interest of all contestants aggregating one-tenth of the remainder.

In addition to the specific objections interposed in this proceeding, which will be treated separately, the contestants have charged the executors with " general negligence " in their conduct of the affairs of the estate.

Negligence when, as in the present controversy, it is divorced from any claim for specific damages alleged to result from particular acts, is a legally meaningless phrase.

The Appellate Division of this department has defined negligence in law as " the violation of duty by an omission or a commission which creates a menace, and when the menace becomes effective by causing injury to a blameless person, liability necessarily follows." (*Birch* v. *City of New York*, 121 App. Div. 395, 397.)

It follows from this definition that to make any act of negligence legally important, it is an essential prerequisite that injury shall result therefrom to a blameless person. Even such a demonstration alone is, however, insufficient, since the culpable act must not merely be demonstrated to be a cause of the damage claimed, but must also be shown to have been the *proximate* cause thereof. (See *Matter of Adriance*, 145 Misc. 345, 348, and cases there reviewed.) In other words, unless the act or omission at which the complaint is directed has, by " a natural and continuous sequence, unbroken by any new cause " (*Laidlaw* v. *Sage*, 158 N. Y. 73, 99), produced the specific damage alleged, the tort feasor

is not bound to answer in damages in respect to it. This basic principle has frequently been noted. In *Croft* v. *Williams* (88 N. Y. 384) it is said (at p. 391): "It is further sought to charge the executor upon grounds of general negligence. He did not file an inventory, but the loss of the item in question is in no manner the consequence of that neglect. He kept no separate accounts, and neglected and postponed a settlement. But the loss did not spring from those omissions. They would justify in the allowance of interest, or the construction of the executor's acts, some degree of severity, but do not, we think, make him liable for a waste due to his co-executor alone, where the loss is not at all traceable to the omissions."

*Matter of Brower* (71 Misc. 398) contributes the following (at p. 400): "Loss. and negligence concurring create no liability of themselves, unless the loss is the result of the negligence. The essential thing is that the negligence must be the cause of the loss."

It follows, therefore, that no action at law or in equity will lie unless damage has been caused as a proximate result of negligence. When, however, the two have been so connected, the latter is not general negligence, but negligence in respect to the particular subject-matter damaged. None other is of any moment so long as the doctrine of proximate cause remains a basic principle of the law.

The first of the so-called "main objections" to be considered relates to the sale by the executors of two parcels of real estate which belonged to the testator during his lifetime. These objections are based, *first*, on the alleged inadequacy of the respective selling prices, and *second*, on the claim that, legally speaking, any sale whatsoever "was unauthorized and unnecessary to a proper administration of the estate."

The first property sold was decedent's family residence on St. Marks avenue. This brought $33,000. Its assessed value at the time of the death was $36,000. The second was a two-family house on Lincoln place, the assessed value of which was $11,100, and the selling price $8,000. The former was about fifty years old, had not been renovated for about sixteen years, and was in bad condition. Its light was partially obstructed by a large apartment building on an adjoining plot. It was unrentable except upon conditions entailing a heavy expense for renovations and alterations. The Lincoln place property was an old-fashioned two-family house, in bad condition, on an extremely narrow street. For some time prior to the testator's death it had had only a single tenant, and considerable trouble was experienced in obtaining rental payments

from him. Efforts to rent the other portion of the building were unsuccessful.

. Beginning about the time of the stock market crash in October, 1929, which was the month of testator's death, the real estate market appreciably declined so that "in 1930 it was almost impossible to give property away." This situation has continued up to the present time.

In spite of these untoward conditions, the executors succeeded in disposing of the St. Marks avenue parcel for $33,000 and of that on Lincoln place for $8,000, which prices wholly unimpeached and obviously competent real estate experts testified were top market prices which would be impossible of procurement today. Based on the wholly uncontroverted testimony of the record, it is obvious that the executors acted most wisely and diligently in their dealings with these properties and that there is absolutely no basis in fact for a contrary contention.

· The second phase of this objection, raised as a question of law, is based on a misconception of the effect of the decision of the Court of Appeals in *Matter of Miller* (257 N. Y. 349). That case involved a testamentary trust, constituted in part of real property, which terminated on the death of testator's son. Under the terms of the will, division of the corpus was directed upon the happening of this contingency. On the death of the life tenant, the trustees accounted in the Supreme Court, where a decree was entered (p. 354) " reciting the fact that the trust estate included a large number of parcels of real property and that the distributees thereof were willing that such property should remain under the control and management of the trustees for an indefinite time, the judgment decreed that the trustees should retain control and management of the real estate until the further order of the court and that they should account, whenever required, for the principal of the fund remaining in their hands."

The Court of Appeals pointed out that this direction of the Supreme Court was wholly unwarranted, saying (at p. 356): " The trustees no longer possessed a right under that instrument [the will] to perform any act of administration in respect to such real property. The trust had ended and no court was warranted in extending the term. That part of the judgment in the Supreme Court action which assumed to bestow upon retiring trustees of a terminated trust a continuing faculty as testamentary trustees to control and manage the real estate for an indefinite duration is unauthorized. * * * Neither by acquiescence nor by express consent of all beneficiaries under the will could a court acquire any such arbitrary power of interference with the command of the testator. The result

follows that the surrogate was dealing with the accounts of one who, whatever may have been his functions between 1919 and 1928 in respect to real estate, was no longer a testamentary trustee. * * *

"After the judgment of 1919 Mr. Hale and his associates were at most, as the Supreme Court may perhaps find, nothing more than trustees by acquiescence or agents by consent" (p. 357).

The utter inapplicability of this decision as a precedent for determination of the facts at bar is most obvious. All which it determines is that the Surrogate's Court has no power to settle the accounts of an individual who, in respect to the transactions in question, was not a testamentary fiduciary. No informed person has ever contended that any such power resided in this tribunal. In the *Miller* case the accountant, in his dealings with the realty, was either a simple agent, appointed by living persons, or was the trustee of an *inter vivos* trust. In either event, the privilege could not be accorded him of having the surrogate adjudicate respecting his acts in such a capacity. (*Matter of Rosenblum*, 146 Misc. 537, and cases cited.)

In the case at bar, however, the accountants are testamentary fiduciaries acting pursuant to an express testamentary power which reads:

"*Fourth.* I authorize and empower my Executor and Executrices hereinafter named, or the survivor of them, to sell and dispose of any and all of the real estate of which I shall die seized or possessed at public or private sale at such times and on such terms and conditions as they or the survivor of them shall deem meet or proper, and to execute, acknowledge and deliver all proper writings, deeds of conveyance and transfers thereof."

The exercise of this power was necessary for the effectuation of the purposes of the will which gave the property of the decedent to his named children "in equal shares."

That a power of this type is entirely valid has been repeatedly determined. (*Crittenden* v. *Fairchild*, 41 N. Y. 289, 292; *Kinnier* v. *Rogers*, 42 id. 531, 534, 535; *Morse* v. *Morse*, 85 id. 53, 58; *Lindo* v. *Murray*, 91 Hun, 335, 337; affd., 157 N. Y. 697.) Since it was given to and exercised by a fiduciary of this court, his actions in respect thereto are properly justiciable here. (Surr. Ct. Act, § 40, subds. 3, 5; *Matter of Morris*, 134 Misc. 374, 382; *Matter of Kirkman*, 143 id. 342, 350; *Matter of Reich*, 146 id. 616, 617.)

This objection is, therefore, in all respects overruled.

The second, so called, "main objection" relates to the rights of the estate in two corporations organized in 1914 and 1918 respectively, for the transaction of the business in which decedent had

been engaged for many years. These corporations were incorporated under the titles of "James A. McCafferty & Sons Manufacturing Co., Inc.," and "Continental Transfer Company."

The account sets forth that at the time of his death the decedent was the owner of 1,344 of a total authorized issue of 3,000 shares of the former, and of 38 of 100 shares of the latter. The purpose of the objections in this regard is to obtain a determination that all of the assets of both corporations were, either directly or indirectly, the property of the decedent and consequently belong to his estate. Their development has assumed a dual and alternative form: *First,* that the corporations were not validly organized and, as a result, the prior ownership of the decedent of the assets transferred to the corporations was not divested; and, *second,* if such contention be not sustained, that his complete ownership of the entire stockholding of the corporations continued up to the time of his death. The former contention is made only on behalf of the Ferguson grandchildren. Both sets of contestants join in the latter.

Respecting the position first enumerated, it may be said that there is neither a scintilla of evidence nor any possible inference on the facts adduced to support it.

The decedent was sixty-nine years of age at the time of the incorporation of the McCafferty Company in 1914. Up to that time he had conducted the business, which was the manufacture of paints and varnish, as an individual. The exact date of its inception was not made to appear. That it was his life vocation is inferentially indicated by the demonstration that at the time of the incorporation his son, James R. McCafferty, had been associated with him in its prosecution for approximately thirty years. There is some intimation that at the time of the organization of this corporation decedent desired to relieve himself from the active duties of the business and to be free for European travel. In any event, in June of 1914 a corporation was organized with an authorized capital of $250,000, to which the decedent transferred the entire assets of the business which he had theretofore conducted as an individual. It is a pertinent circumstance in this connection, as bearing upon testator's mental attitude at that time, that the corporate name selected was James A. McCafferty & *Sons* Manufacturing Co., Inc. The decedent became the president of the company and joined with him. as its directors and officers his two sons, James R. and Ambrose T. McCafferty. The authorized capital stock was allocated to these two sons and to the decedent in approximately equal amounts, and during their joint association with the corporation their salaries were identical.

Respecting the actuality of the corporate existence, it is sufficient to note that all requisite legal steps for valid incorporation met with compliance and all necessary corporate formalities were accomplished. All properties previously used by the decedent in connection with the enterprise were transferred to the corporation and the business was thereafter exclusively conducted in its name. Its plant at Driggs avenue and North Ninth street covered between fifteen and sixteen city lots of two-, three- and five-story buildings. It owned machinery and equipment and regularly employed between twenty-five and thirty persons. It maintained its separate bank account, in which the corporate funds were deposited and from which its payments were made. This was entirely distinct from the individual bank accounts of the decedent. It filed its regular tax reports, and bought and sold merchandise in the corporate name, the sales of its products running to a value of from $500,000 to $750,000 annually.

Under such circumstances, a contention that the corporate entity was non-existent borders on the fantastic. If ever a corporation was validly organized and conducted as a separate legal entity, this one was.

The same conditions, to a lesser degree, apply to the Continental Transfer Company. This corporation was organized by the McCafferty corporation in 1918 for the purpose of transacting its trucking business, and was then and for some time after a substantially wholly owned subsidiary.

Absolutely nothing has been shown to warrant a determination that both corporations were not at all times subsequent to their organization valid separate legal entities, the corporate existence of which cannot be disregarded.

As this court had occasion to remark in *Matter of Richman* (142 Misc. 103, at p. 107): " A corporation, validly organized, is a legal entity separate from its stockholders, and, as such, is capable of incurring and acquiring valid obligations and rights distinct from those of its stockholders. (*Werner* v. *Hearst*, 177 N. Y. 63.) While courts have on rare occasions disregarded this legal conception, such action has occurred only where it was made to appear that the incorporation was effected solely ' for the purpose of evading the law, or for the perpetration of fraud.' (*Erickson* v. *Revere Elevator Co.*, 110 Minn. 443.) A piercing of the veil of corporate entity can only be accomplished where extremely cogent equities for such a procedure are demonstrated and the rights of third parties would not thereby be jeopardized. (For illuminating discussions involving these principles, see the articles by Prof. Wormser in 12 Columbia

Law Review, 496 and 23 id. 702.)" (See, also, *Matter of Shafran,* 143 Misc. 754, 759.)

Nothing of a remotely fraudulent nature is shown in this transaction. The inference is strong that James A. McCafferty, then on the threshhold of the traditional three score years and ten, decided to relax his extreme activity in connection with the business in favor of his sons, one of whom had been associated with him in its management for a generation and a half. This was what was done. It was certainly not strange or unusual, and least of all fraudulent, and is not subject to impeachment by these contestants or by any one else on the demonstration in the record of this case.

The second phase of this objection is, in reality, merely an attack upon the validity of the individual record ownership by James R. McCafferty, one of the accounting executors, of 1,466 shares of James A. McCafferty & Sons Manufacturing Co., Inc., and of 50 shares of Continental Transfer Company.

The history of these holdings is fully reflected in the corporate records of the two companies and in the testimony on the hearings in this case. At the time of the incorporation of the McCafferty Company, in June, 1914, the signers of the certificate were the decedent, James A. McCafferty, who subscribed for eight shares, and his two sons, James R. and Ambrose, who subscribed for one each. At the organization meeting, certificates for these shares were duly made out to each, that to James A. being No. 1, to James R., No. 2, and to Ambrose, No. 3. At this meeting, also, the decedent sold his business and business assets to the corporation for the entire authorized capital stock of $250,000, plus a note for $60,000. In pursuance of this arrangement, there were issued to James A., certificates Nos. 4, 5 and 6 for 500 shares each, Nos. 7, 8 and 9 for 200 shares each, Nos. 10, 11 and 12 for 100 shares each, and Nos. 13, 14 and 15 for 30 shares each. This, with the three qualifying certificates, completed the issuance of the total authorized capital of 2,500 shares. All of these certificates were duly signed by the proper officers of the company and were dated June 25, 1914. Two days later, on June 27, 1914, certificates Nos. 1 and 4 to 15, inclusive, aggregating 2,498 shares were indorsed, witnessed and canceled, and in their stead, certificate No. 16 for 834 shares was issued in the name of James A. McCafferty, No. 17 for 832 shares was issued in the name of James R. McCafferty, and No. 18 for 832 shares was issued in the name of Ambrose T. McCafferty. This again exhausted the authorized stock of the company, and left the following stock outstanding: James A. McCafferty, 834 shares, represented by certificate No. 16; James R. McCafferty, 833 shares,

represented by certificates Nos. 2 and 17, and Ambrose T. McCafferty, 833 shares, represented by certificates Nos. 3 and 18.

The next step in the stock history took place on March 1, 1919, at which time the capital stock of the company was increased from $250,000 to $300,000. At a meeting of the directors held on December thirty-first of that year, a resolution was adopted " that a dividend of twelve per cent (12%) be and hereby is declared upon the outstanding common stock of this company, payable in common stock of said corporation, on and after this date to James A. McCafferty in the amount of 100 shares, James R. McCafferty in the amount of 100 shares and Ambrose T. McCafferty in the amount of 100 shares, said stockholders appearing of record at 3:30 P. M. on this day and the only stockholders of said corporation."

These minutes are personally signed by James A. McCafferty as president and by James R. McCafferty as vice-president and treasurer. It should be noted that twelve per cent on 833 shares, which was the holding of each of the two sons, equalled 99.96 shares and on the holding of 834 shares of James A. McCafferty, equalled 100.08 shares.

Pursuant to this resolution, three certificates for 100 shares each were issued, No. 21 to James A. McCafferty, No. 22 to James R. McCafferty and No. 23 to Ambrose T. McCafferty. This brought the stockholdings of James A. to 934 shares and of James R. and Ambrose to 933 each.

Ambrose died on March 28, 1921, and after some negotiations James A. purchased from his estate his 933 shares of stock in the company for the sum of $85,000, the three certificates, Nos. 3, 18 and 23, being duly indorsed and turned over by his administratrix.

Under date of November 20, 1922, the 933 shares formerly belonging to Ambrose, and thus purchased by James A. McCafferty from his estate, were reissued as follows: To James R. McCafferty, certificate No. 20 for 533 shares, and to James A. McCafferty, certificates No. 25 for 299 shares, No. 26 for 100 shares and No. 27 for 1 share. This made up the total so purchased from the estate of Ambrose, and brought the aggregate holdings of James R. McCafferty to 1,466 shares.

The attack upon this ownership is based solely on the allegation that the certificates for his shares, namely, Nos. 2, 17, 20 and 22, whereas duly signed by the proper officers of the company and sealed with the company seal, were not physically delivered by the decedent to his son, James R. McCafferty. This position is predicated only on an inference alleged to be raised by reason of the fact that aside from these certificates, those originally issued in the name

of Ambrose, and No. 16 for 834 shares to James A. McCafferty, which was pinned back, none had been physically detached from the stock certificate book up to the time of the trial. It was further indicated, at least inferentially, that the shares in the name of Ambrose had not been detached prior to his death, and were taken out of the book only to permit of their indorsement by his administratrix at the time of their purchase from his estate by James A. McCafferty.

Even were it established that James R. McCafferty did not take these certificates into his physical possession until after the death of his father, this fact would not be decisive on the issue. The stock certificates were duly signed by the proper officers of the company and sealed with its corporate seal. One of. such signers was the decedent, and it was established that such subscriptions by him were in his handwriting. The stock certificate book was for considerable periods, at least, kept in the outside safe in the front office of the company, to which the office employees had full access. James R. McCafferty was at all times an officer of the company and for the greater part, if not the entire period under review, its treasurer. Under such circumstances, the certificates, even if not physically detached, were both actually and constructively in his possession. If, therefore, for his own convenience, he permitted them to remain undetached from the book, for a part or even all of the period, such act cannot be held to be decisive against his actual ownership thereof.

Quite aside from this, however, it seems apparent that the stress laid upon this phase of the subject by the objectors is due to a misconception of the law in regard to the effect of a stock certificate as bearing upon the ownership by an individual of the interest in the corporation evidenced thereby.

Section 10 of the Stock Corporation Law provides, among other things, that "Every stock corporation shall keep at its office * * * a book to be known as the stock book, containing the names, alphabetically arranged, of all persons who are stockholders of the corporation, showing their places of residence, the number of shares of stock held by them respectively, the time when they respectively became the owners thereof, and the amount paid thereon * * *

"The stock book * * * of every stock corporation shall be presumptive evidence of the facts therein so stated in favor of the plaintiff, in any action or proceeding against such corporation or any of its officers, directors or stockholders."

This corporation kept such a book, in which the following appears:

" Name James R. McCafferty, Residence 656 Eastern Parkway, Brooklyn, N. Y.

| Time Became Owner | From whom shares were transferred (Original issue enter as such). | Certificates issued | | Amount paid thereon | Number of Shares held (Balance). |
|---|---|---|---|---|---|
| | | Certif. Nos. | No. Shares | | |
| 1914 | | | | | |
| June 27 | Original issue.......... | 2 | 1 | $100 | ....... |
| 27 | Original issue.......... | 17 | 832 | 83,200 | 833 |
| 1922 | | | | | |
| Nov. 20 | Certificate No. 18, James A. McCafferty...... | 20 | 533 | 53,300 | 1,366 |
| 1919 | | | | St. Div. | |
| Dec. 21 | Original issue.......... | 22 | 100 | 10,000 | 1,466 " |

So far as any demonstration in the present record is concerned, it is obvious that these entries, in view of the presumption of the statute, establish as against the corporation and any of its officers, of whom decedent was one, the ownership by James R. McCafferty of 1,466 of the 3,000 shares of the McCafferty Company, and that this would be the case even if no stock certificates whatsoever, evidencing such interest, had ever been issued.

The objectors apparently entertain the erroneous idea that the possession of a stock certificate is a *sine qua non* to the ownership of an interest in a corporation. Of course this is not, and never was, so. As is pointed out by the United States Supreme Court in *Richardson* v. *Shaw* (209 U. S. 365, at p. 378): " the certificate of shares of stock is not the property itself, it is but the evidence of property in the shares. The certificate, as the term implies, but certifies the ownership of the property and rights in the corporation represented by the number of shares named."

This thought is further developed by Judge CULLEN, writing for the unanimous court in *Zander* v. *N. Y. Security & Trust Co.* (178 N. Y. 208, at p. 212): " A stock certificate is merely a muniment or representative of title. The stock which it represents exists apart from the certificate and its existence is contemplated to endure so long as the corporation continues. The owner, as he appears on the books of the company is entitled to the dividends or profits, and it is only when he seeks to transfer his title to another that a surrender of the outstanding certificate is required as a condition precedent to the issue of a new one."

In *Burr* v. *Wilcox* (22 N. Y. 551) it is said (at p. 555): " The certificate is simply a written acknowledgment by the company of the interest of the subscribers in its property and franchises. It transfers nothing from the company to the subscriber, but simply affords to the latter evidence of his right."

*Wheeler* v. *Millar* (90 N. Y. 353) adds the following (at p. 357):

"the certificate is only evidence of ownership. Its issue and acceptance show an acknowledgment of that fact on both sides, but such acknowledgment may equally be inferred from other facts in the absence of a certificate." (See, also, *Kohlmetz* v. *Calkins*, 16 App. Div. 518, 520; *Hoagland* v. *Bell*, 36 Barb. 57, 58.)

A further demonstration that ownership of shares in a corporation is determinable primarily from its books, quite irrespective of the possession or lack of possession of a stock certificate, is found in the exercise of the only rights to which a stockholder is entitled in a going concern, namely, to vote and to receive dividends. By section 47 of the Stock Corporation Law the right to vote is determinable, not on the basis of whether or not the individual holds a certificate of stock, but by the record of his holdings as set forth on the books of the company. The books are also the sole criterion for a determination as to the persons to whom dividends are payable. (*Robertson* v. *de Brulatour*, 188 N. Y. 301, 311; *Brisbane* v. *Delaware, L. & W. R. R. Co.*, 94 id. 204, 208; see, also, *Zander* v. *N. Y. Security & Trust Co., supra.*)

The foregoing makes it entirely evident that even if James R. McCafferty did not actually receive the certificates for his 1,466 shares of the stock of the McCafferty Company, which is far from being demonstrated, he is nevertheless the owner thereof.

The question is, however, capable of ready determination in yet another way. The effect of the present objections is similar to that of the usual discovery proceeding, with the objectors occupying the situation customarily filled by the estate fiduciary. They are seeking to bring into the estate certain property which they claim belonged to the decedent at the time of his death. The sole issue is as to whether or not the testator actually owned it at such time. In the trial of such an issue, all other direct evidence being lacking, declarations of the testator on the subject against his personal interest have the most cogent conceivable bearing. (*Kittredge* v. *Grannis*, 244 N. Y. 168, 175; *Card* v. *Moore*, 68 App. Div. 327, 341; affd., 173 N. Y. 598; *Matter of Woodward*, 69 App. Div. 286, 292.) Such declarations against interest, over the duly authenticated signature of the testator, appear in the minute book of the corporation. (Respondents' Exhibit 8.) Quotations from the minutes of the meeting of December 31, 1919, have already been given, demonstrating that at that time the decedent admitted the ownership by James R. McCafferty of 833 shares of the McCafferty Company. The effect of that meeting itself was to vest in him the right to 100 additional shares. The minutes of the meeting of May 24, 1928, read in part as follows: " *Resolved, that a dividend of eight (8%) per cent on the common capital stock issued and outstanding*

*be declared* from the surplus earnings of the company, said dividend being in the amount of Twenty-two Thousand, Four hundred eighty ($22,480.) Dollars, payable to the stockholders of record, in accordance with their respective stock ownerships * * * and the officers of the corporation are duly authorized to draw the necessary checks in payment of said dividend as follows: To James A. McCafferty, the owner and holder of One thousand Three Hundred Forty-four (1,344) shares, the sum of Ten Thousand, Seven Hundred Fifty-two ($10,752.) Dollars; *to James R. McCafferty, the owner of One Thousand Four Hundred Sixty-six (1,466) shares, the sum of Eleven thousand, Seven Hundred Twenty-eight ($11,728.) Dollars."* (Italics not in original.)

These minutes are duly signed by the decedent, such signature appearing on the same page of the minute book as that on which all except the first three lines of the foregoing resolution is written.

The checks referred to in the resolution were both duly issued by the corporation, signed by the decedent (Petitioners' Exhibits 13, 14), and were paid when presented.

This statement of the rights of James R. McCafferty renders superfluous any reference to the independent assignment by his father to him of the last 533 shares out of the stock purchased from the estate of Ambrose. (Respondents' Exhibit 10.)

The objection in relation to the ownership of the stock of the Continental Transfer Company is capable of even more ready disposition. This company was incorporated in May, 1918, for the purpose of transacting the trucking business of the McCafferty Company. Payment for its capital stock was made by the transfer to it of four trucks owned by the McCafferty Company. Ninety shares were issued at the time of its organization, one qualifying share each to James A. McCafferty and James R. McCafferty, and the remaining eighty-eight to the McCafferty Company. It was, therefore, a substantially wholly owned subsidiary of the latter. At a meeting of the board of directors of the McCafferty Company held on December 26, 1928, it was voted to sell fifty of these eighty-eight shares originally issued to the McCafferty Company to James R. McCafferty for $5,000, and the remaining thirty-eight to James A. McCafferty for $3,800. These transactions were consummated. Since the McCafferty Company was a legal entity, separate and distinct from James A. McCafferty himself, there is no conceivable theory on which any claim could be based by James A. McCafferty or his estate to the ownership of these fifty shares duly sold to James R. McCafferty.

It follows that this objection must be overruled in its entirety.

The next objection for consideration relates to the exercise of certain rights to subscribe for stock, and to convert bonds into stock, upon which the executors acted between the date of the death and July 16, 1930.

The date of death was, as stated, October 3, 1929. For some seven or eight months prior to that time, decedent had maintained a custodian account of certain of his securities with the Broadway, Brooklyn, branch of the Manufacturers Trust Company. This account, among other things, contained 900 shares of the stock of the Consolidated Gas Company. Early in September, 1929, this company issued to its stockholders rights to subscribe for one additional share of stock for each ten owned, upon a payment of seventy-five dollars. These rights expired on October eleventh and the last day on which they were salable was October tenth. On two occasions, prior to his death, the trust company sent notices to the decedent of the receipt of these rights and requested his instructions regarding the disposition to be made of them. On October second, decedent's son, James R. McCafferty, directed them to exercise the rights. The transaction was consummated on October eighth and the certificates for the new shares placed in the decedent's custodian account. It was testified that the value of the rights on the last day on which they were salable was eight dollars and twenty-five cents each, and an attempt is made to surcharge the account of the executors by a sum equal to their value, plus the amount paid on the subscription, aggregating about $14,000, and upon its payment to surrender the stock to them.

The second questioned transaction of this type relates to the exercise of rights to subscribe for additional shares of stock of the Pennsylvania Railroad Company. These permitted stockholders of record on December 7, 1929, to purchase one new share for each eight shares formerly owned. These rights expired on January 15, 1930, and were exercised, pursuant to the directions of Mr. James R. McCafferty, on the fifth of that month. The surcharge urged in this regard aggregates $876.88.

The third transaction took place on or about March 10, 1930, and concerned the exercise by the executors of rights to subscribe for twenty per cent additional Baltimore and Ohio Railroad Company four and one-half per cent thirty-year convertible bonds at ninety-five. These bonds were not a legal investment for trust funds. The claimed surcharge based on this transaction amounts to $2,010.

On March 19, 1930, the executors exercised the privilege of converting $5,200 par value of American Telephone and Telegraph Company four and one-quarter per cent bonds into fifty-two shares

of its stock. Unlike the transactions heretofore noted, this was not an act the immediate performance of which was required under penalty of loss of rights, since the privilege of such conversion did not expire until December 31, 1937. The claimed surcharge in this respect aggregates $12,636.

The decedent was the owner of sixty-seven shares of stock of the Missouri State Life Insurance Company. On May 16, 1930, it granted to stockholders the right to subscribe at ten dollars for one additional share for each four held. The right expired on June 28, 1930. The estate was, therefore, entitled to subscribe for sixteen and three-fourths shares. The executors purchased one additional right for six dollars and subscribed for seventeen shares. The alleged damage to the estate in this connection amounts to $438.56.

The final transaction which is attacked in this connection relates to the payment of $1,250 for fifty units of Selected Industries. A contract for the purchase of this stock was made by the decedent himself on January 14, 1929. He bought these units on a fifty per cent paid basis. The final installment of the purchase price, amounting to $1,250, fell due in December, 1930, and was paid on the twenty-third of that month.

As has been noted, the decedent died on October 3, 1929. His will was not admitted to probate and letters executory issued until March 6, 1930. It is apparent, therefore, that the authority of the executors to deal with the assets of the estate began only on the latter date. It follows that the transactions hereinbefore outlined are naturally divisible into two groups, the first comprising those which took place prior to the grant of letters, including the Consolidated Gas and Pennsylvania Railroad subscriptions, and the second, those which transpired after the executors were duly qualified and acting as such, covering the remaining four.

Section 223 of the Surrogate's Court Act, relating to the "Power and duty of executor before probate," provides: "An executor named in a will has no power to dispose of any part of the estate of the testator before letters testamentary are granted, except to pay funeral charges, nor to interfere with such estate in any manner further than is necessary for its preservation."

The law as thus codified is entirely clear. (See *Matter of Hammond*, 198 App. Div. 634, 637; *Matter of Marcellus*, 165 N. Y. 70, 77; *Matthews* v. *American Central Ins. Co.*, 154 id. 449, 461.)

The accountants, in respect to the disposition of the rights on the Consolidated Gas and Pennsylvania Railroad shares owned by the decedent, were faced by a reality and not merely a theory. They owed a very real obligation to preserve the assets of the estate. The rights on these stocks were in the nature of perishable commodi-

ties. If the putative executors did nothing in regard to them prior to October 10, 1929, in the former case, and January 15, 1930, in the latter, they would be wholly destroyed. That they possessed a sizable tangible value the contestants have been at some pains to demonstrate. Not only the practical impossibility of giving title, but the precise terms of the statute, inhibited the possibility of their sale. (*Humbert* v. *Wurster*, 22 Hun, 405, 406; see, also, *Thomas* v. *Cameron*, 16 Wend. 579, 581.) Had the executors permitted this asset, which the brief of one of the contestants values at $7,473.13, and to which one of their witnesses attaches an even greater value, to evaporate into thin air, the contestants unquestionably would have protested most violently against such an act. The accountants did the only reasonable thing open to them under the circumstances for the preservation of the estate, and their act in this regard is not subject to any just criticism.

Their acts subsequent to their receipt of letters testamentary naturally subdivide themselves into three groups. The first concerns the comparatively insignificant item of the rights on the Missouri State Life Insurance Company stock. It appears from the record that they made all reasonably necessary efforts to effect a sale of these rights, but were unable to find a purchaser, and were advised by the company itself that they could not be sold. Indeed, contestants' statistician, who was the only opposing witness on this branch of the inquiry, was unable to demonstrate that any sale of similar rights was ever made. The rights admittedly had some value. The problem of the executors in this regard was, therefore, similar to that which they had previously faced in connection with the Consolidated Gas stock. They elected to conserve this asset rather than permit its destruction. Their good faith in making this decision has not been impugned and the court cannot concur in the position of the contestants that their act in this regard was in the least culpable.

In their payment of the balance due on the contract made by the testator for the purchase of the Selected Industries units, they were performing an ordinary executorial duty in paying an obligation which the testator himself had incurred. (*Chamberlain* v. *Dunlop*, 126 N. Y. 45, 52; *Matter of Corbin*, 101 App. Div. 25, 29.) It was not demonstrated by the contestants that these units could have been sold subject to this unpaid obligation, and this is not a subject familiar to the court concerning which it could take judicial notice. In any event, the decedent, at the time of his death, was the owner of this stock, although it was subject to a lien for the unpaid portion of the purchase price. The question for determination in this connection is, therefore, rather one of whether the executors should

have completely sold out all interest of the decedent in this security than of whether they should have paid his existing contract indebtedness in respect to it. This will be considered *infra* with the other objections of this type.

There remain for consideration, therefore, only the subscription for the legally unauthorized Baltimore and Ohio bonds, and the conversion of the American Telephone and Telegraph bonds into stock.

All courts dealing with such matters have repeatedly pointed out that, absent express contrary authorization in the will, it is the duty of testamentary fiduciaries to place the funds of the estate only in securities which diligent and prudent men of discretion would purchase, and which, in addition, are authorized for trust investment by the pertinent statutes of this State. (*Matter of Kruger*, 139 Misc. 907, 908; 141 id. 475, 476; *Matter of Herriman*, 142 id. 164, 165; *Matter of Lewis*, Id. 392, 393; *Matter of Surpless*, 143 id. 48, 52; *Matter of Blake*, 146 id. 780.) Furthermore, in the absence of express testamentary authorization, such a fiduciary is not permitted to increase unauthorized holdings which have come to him from the testator. (*Matter of Davison*, 134 Misc. 769; affd., 230 App. Div. 867; *Matter of Blake*, 146 Misc. 780.)

In both of the instances presently under consideration the present executors violated these principles. In connection with the Baltimore and Ohio bonds, they actually dedicated new funds to the enterprise. With the telephone bonds, they, in effect, liquidated the prior investment of the testator and reinvested the avails in an unauthorized manner. These acts were improper and are justly subject to criticism.

The contestants have, however, mistaken the measure of the damages, if any, which have accrued by reason of these improper acts. In their position of objectants, they are in effect prosecuting a representative action on behalf of the estate in an effort to have made up to it any losses which have occurred by reason of malfeasances of the executors. All to which the estate is entitled is to have any damage which has occurred repaired. This does not mean that they can say to the executors that because the investments were improper, they are repudiated *in toto*, and the latter will be compelled to refund the entire sums so expended, even with a permission to take over the securities upon compliance. So long as these investments have any value whatsoever, the damage sustained is less than the total price paid, and the executors cannot be compelled to refund the total.

This principle was noted by this court in *Matter of Adriance*

(145 Misc. 345, 349) in the following words: " If the language of section 111 of the Decedent Estate Law be scrutinized, it will be observed that the provisions thereof are permissive merely, in that it is provided that ' an executor  *  *  *  may invest the same ' in the specified class of securities. His failure to do so casts upon him an onus of explanation, and a liability for loss provided the loss accrues by reason of his failure to adopt the variety of investments enumerated by the Legislature. No case has been found in which it is declared that a fiduciary making an unauthorized investment is, *ipso facto*, guilty of a devastavit, irrespective of the ultimate result of his act. If loss occurs by reason of his act, he becomes *prima facie* liable. Indeed, it would probably be held that such a loss, demonstrated to be a direct result of his act, would raise an irrefutable presumption of liability to the extent that the trust had suffered from his unauthorized act. This, however, is far from saying that by reason of such act he has, in effect, outlawed himself from the company of faithful fiduciaries. In practical effect, his purchase of such securities results in the imposition upon him of a contract of guaranty in favor of the estate, that a loss will not result thereto by reason of his act.

" It follows, therefore, that the only theory upon which recovery against the trustee can be predicated is that his act of unauthorized investment was the cause of loss to the estate."

In any event, loss to the estate is the only basis of a surcharge, and this loss must be demonstrated in dollars and cents in order to make possible a decree that the executors shall make it good. This has not been shown. If, and when this is done, the court will render a decree directing the executors to repair it. (*Matter of Gerken*, 142 Misc. 271, 273.)

Both objectants seek to surcharge the executors by reason of their failure to account for an alleged indebtedness of the McCafferty Company to the decedent in the sum of $60,000 on a note claimed to have been given in 1914 as a part of the purchase price of the business assets on the incorporation. The executors disclaimed knowledge of any such note, and the books of the company fail, subsequent to 1922, to show any obligation even remotely resembling the one alleged. It further appeared on the trial that financial statements showing the assets and liabilities of the company were made up for the years 1924, 1925 and 1926. These were personally checked by the decedent with the accountant who prepared them and were inferentially approved by him. These fail to show any such obligation.

In such a situation the law is entirely clear that " the burden of establishing assets of the estate in addition to those accounted for,

is upon the contestants." (*Matter of Fisher*, 124 Misc. 836, 839.) The matter must "not be left to mere conjecture and suspicion." (*Matter of Baker*, 42 App. Div. 370, 372.) "An executor cannot be charged with property simply upon surmise or evidence so vague as to put the court to a mere guess." (*Matter of Wilson*, 127 Misc. 518, 525.) This burden extends to all particulars of the validity of the asset by the value of which the surcharge is to be measured. All that was here shown was that in June, 1914, it was voted by the company to purchase certain assets from the decedent for $250,000 worth of stock and a $60,000 note. Aside from the testimony of the attorney who presided over the incorporation, and who is the father of four of the seven contesting parties, there is nothing in the record to indicate that such a note was ever given. Without in any way impugning his veracity, it is not inconceivable that after the lapse of almost twenty years his recollection of this detail, which cannot have been one of particular moment to him at the time, may have been somewhat dulled, with the result that the wish became father to the thought. In any event, however, and granting that such a note was actually given, there is no presumption of its continuance as a valid obligation of the company after the expiration of six years from its delivery (Civ. Prac. Act, § 48), which terminated in 1920. No demonstration of written acknowledgment of any liability by the corporation or payment on account (Civ. Prac. Act, § 59) was made by the contestants, wherefore it must be held that they have utterly failed to demonstrate that when the decedent died in 1929, there was any outstanding obligation in this regard due him from the corporation for which the executors are accountable. This objection must, therefore, be overruled. (*Matter of Mullon*, 145 N. Y. 98, 104; *Matter of Rogers*, 153 id. 316, 328; *Matter of Stevenson*, 86 Hun, 325, 327; *Matter of Baker*, 42 App. Div. 370, 372; *Matter of Perry*, 129 id. 587, 588; *Matter of Hunter*, 170 id. 934; *Matter of Swiller*, 205 id. 302, 305; *Marre* v. *Ginochio*, 2 Bradf. 165, 167; *Matter of Palmer*, 3 Dem. 129, 130, 131; *Matter of Wagner*, 40 Misc. 490, 491; *Matter of Fisher*, 124 id. 836, 839; *Matter of Murtha*, 130 id. 330; *Matter of Schlossman*, 136 id. 893, 897; *Matter of Richman*, 142 id. 103, 109; *Matter of Wanner*, 146 id. 722.)

Before approaching the decision of what is perhaps the most important of the objections interposed in the proceeding, relative to the depreciation in market value of the securities in the estate, a series of minor objections requires consideration.

No evidence was adduced to support that respecting the alleged loss by reason of retention of furs received from the Loretta McCaff-

erty estate, and it is accordingly dismissed. Nos. 3 and 5 of the McCafferty objections were withdrawn on the trial, and the amendment of Schedule F, made at that time, eliminated the Ferguson objection numbered 12.

No. 16 of the McCafferty and No. 8 of the Ferguson objections seek surcharges aggregating $316.15 for penalty interest on the Federal estate and real property taxes. The only exculpating testimony of the executors in this regard was that the time had run by unnoticed. This is an inadequate excuse for a fiduciary charged with a duty of care and vigilance, and there is no reason why the objecting distributees should be penalized in this regard. This objection is accordingly sustained.

McCafferty objection 13 and Ferguson objection 9 relate to withdrawals of sums by way of commissions to the executors, and a distributive payment of $10,000 to one of them. Petitioners concede at pages 46 and 47 of their brief that such payments were improper. Both will be treated as prepayments on account of distributive shares and the payees will be charged with interest thereon at the legal rate from the respective dates of such payments.

In support of Ferguson objection No. 10 and McCafferty objection No. 15 it was demonstrated that Mrs. Stubbard, testator's daughter, who had managed his household during his life, continued to occupy the family residence for several months subsequent to his death, and that the estate paid her household and living expenses during this period. This was, of course, wholly without legal justification, as was admitted by the accountants on the hearing. These improper payments aggregated $2,201.23 according to the concession in petitioners' brief (p. 47), and in accordance with their stipulation, therein contained, will be charged as advances against the shares of the three non-contesting distributees.

The court is wholly out of sympathy with McCafferty objection No. 18, corresponding to Ferguson objection No. 11, which seeks to surcharge the executors with the sums repaid to the McCafferty Company subsequent to the probate, for moneys expended for the benefit of the estate subsequent to the death and prior to the qualification of the executors. The contestants are appealing to a court which, in relation to the particular subject-matter intrusted to its jurisdiction, has the broadest possible equitable powers. (*Matter of Dickman*, 142 Misc. 207, and cases cited on p. 209.) That one who seeks equity must do it is perhaps the oldest and most fundamental of the maxims of Chancery procedure. To be sure, the McCafferty corporation was a separate legal entity, but its total ownership by the estate and the son of the decedent who was named as his principal executor wholly removed it, in equitable

cognizance, from the position of a stranger. If a formal agreement for a loan to meet the obligations and for the conservation of the estate, pending probate, had been made by this putative executor, this would have become a valid obligation of the estate upon his due legal qualification. (*Matter of Denton* v. *Sanford,* 103 N. Y. 607, 612; *Allen* v. *Eighmie,* 9 Hun, 201, 202; *Vroom* v. *Van Horne,* 10 Paige, 549, 558.) To hold that merely because no formal agreement was made by him in his capacity as virtual conservator of the estate with himself as the executive head and controlling stockholder of the McCafferty Company, the latter, in doing these beneficial acts for the estate, was a mere volunteer, would be to exalt a mere formality to a position of controlling importance utterly abhorrent to all equitable doctrines. This objection is overruled.

The final and most financially important question for determination concerns the alleged liability of the executors for losses which have occurred by reason of depreciation in the market values of the general investment securities which came into their hands from the testator. These consisted of bonds and common and preferred stocks. The aggregate value of these securities at the date of the death of the testator, in October 1929, as fixed in the transfer tax proceeding, was approximately $963,000. As of August 31, 1932, their market value had fallen to about $353,000 according to the supplemental and amended schedules of the accountants. This does not include an apparent depreciation in selling price of approximately $46,700 on securities which the executors received from the estate of Loretta McCafferty in 1931. In other words, these particular assets of the estate show an apparent loss in value of between $600,000 and $700,000. It is a claim of surcharge for this depreciation with which the present objections are concerned.

There is little or nothing legally new which can be said respecting the rules of law which govern the determination of the questions here involved, as the basic principles of an executor's obligations have been repeatedly and uniformly decided.

The primary duties of executors, as is noted in *Matter of Kohler* (231 N. Y. 353, 365), are to settle and distribute the estate of the decedent.

" In the settlement of the estate their duties require them to collect the securities, sell the property and convert the assets of the estate into cash, and then pay therefrom the debts, funeral and testamentary expenses, and distribute the net residue in accordance with the provisions of the will."

The classic and oft-reiterated statement respecting the characteristics which must be displayed by them in this regard is that they

owe a duty to be faithful, diligent and prudent. (*King* v. *Talbot*, 40 N. Y. 76, 84.) The connotation of the first two terms is self-evident; meaning that the fiduciaries shall exhibit good faith (Id. p. 85) and " industry " or " careful and persevering effort to accomplish what is undertaken." (Stand. Dict. 1930 ed.) The necessity for the possession of these two characteristics is obvious and fundamental. Prudence is defined as " care to avoid practical mistakes or entanglements; caution; circumspection." (Stand. Dict.) The degree in which this characteristic, as well as diligence, will be required from a testamentary fiduciary is stated in *King* v. *Talbot* (*supra*, at p. 85) as " such diligence and such prudence * * * as in general, prudent men of * * * intelligence in such matters, employ in their own like affairs."

Reduced to its lowest terms, this resolves itself pretty much into the conception of that amiable fiction of the law, known as the average reasonable man, and results in the formula that in addition to displaying good faith, the testamentary fiduciary shall demonstrate in respect to his conduct of the estate affairs, the careful and persevering effort which the average industrious man of intellect and caution would display in the conduct of his own affairs of a similar nature.

In making a decision as to whether any acts of which complaint is made measure up to this standard, " we must ' look at the facts as they exist at the time of their occurrence, not aided or enlightened by those which subsequently take place ' (per PECKHAM, J., in *Purdy* v. *Lynch*, 145 N. Y. 462, 475); for it is an obvious truth that ' a wisdom developed after an event and having it and its consequences as a source is a standard no man should be judged by ' (per COLLIN, J., in *Costello* v. *Costello*, *supra*, at p. 262); and it is impossible to say that trustees are wanting in sound discretion ' simply because their judgment turned out wrong ' (per HOLMES, Ch. J., in *Green* v. *Crapo*, 181 Mass. 55, 58)." (*Matter of Clark*, 257 N. Y. 132, 136.)

The first step toward decision is, therefore, for the court to place itself, so nearly as possible, in the position of the fiduciary at the time the particular alleged acts or omissions took place.

This testator died on October 3, 1929, possessed of a considerable number of stocks and bonds which he had purchased during his lifetime, some of them as early as eighteen years before his death. These were all in a custodian account with the Manufacturers Trust Company. As a result of statements during his lifetime, his children had come to the conclusion that he had left a will, but no such instrument came to light until December, when it was found by his daughter in an old suit of clothes. A petition

for its probate was filed on January 22, 1930, and it was duly admitted and letters testamentary issued on March sixth.

The terms of the will were simple. Except for a bequest of $3,000 to each grandchild who survived him, the testator gave everything to his four named children, Loretta, Catherine, Florence and James R., and appointed all four executors. Loretta had predeceased the testator, and from the time of the finding of the will until the conclusion of the proceeding for its construction heretofore referred to, the surviving children and the representatives of Catherine, who died on January 5, 1930, believed that they were the sole persons interested in the estate, and mutually agreed to hold all the securities and to distribute them in kind.

Turning now to a consideration of the financial markets, it was developed at the trial that all securities, including those owned by the decedent, had had a continuous rise from 1924 until one week to the day after the testator's death. On October 10, 1929, the first severe break in the stock market occurred. This was not limited to any particular security or market, but covered all. Securities were thrown over for what they would bring and this resulted in still further low prices through impairment of margins and security for bank loans with consequent enforced selling, with the result that at times securities could not be sold at any price. This was followed by another crash in November, after which the securities markets " kept crashing." There was a slight rise in prices in April, May and June, 1930, but since that time there has been a continuous decline with small flurries in the spring and fall of each year. " Since 1930, which appeared to be a pretty low point, it is a fact stocks have declined again as much as they had declined from October, 1929. In other words, what seemed " in 1930 " to be a low point has proved to be now a high point and they have depreciated almost an equal amount " since then. The market has remained in a state of collapse up to the present time.

All this has been duly proved in the record, but aside therefrom, were the court to fail judicially to notice the conditions prevailing through the world during this period, it would be negativing the possession of the intelligence which the rule of *King* v. *Talbot* requires of a testamentary fiduciary. As was said by Surrogate SLATER (*Matter of Winburn*, 140 Misc. 18, 20) of the business conditions since October, 1929, "* * * the court will take judicial notice that the business depression since such time has been the worst and most far-reaching in the history of the world." To this Surrogate HENDERSON adds: " It was an unusual occurrence, for no such general and severe decline has ever occurred before." (*Matter of Lazar*, 139 Misc. 261, 262.)

One of the tests of the proper conduct of fiduciaries enumerated in *King* v. *Talbot* meets compliance in an unusually striking manner in the facts of this case. It is that the executor shall deal with the assets of the estate as he would with his own like affairs. Here, up to June, 1932, when the decision of the Appellate Division was rendered affirming this court's construction of the will, the executors believed that they were dealing with property which belonged to them exclusively. Furthermore, James owned and continued to hold through this entire time many identical securities. That the executors were " intelligent " has not been challenged and is beyond question.

The sole issues, therefore, are whether they were diligent and exercised the prudence of the average reasonable man under the circumstances.

In this connection it will be worth the while to analyze the acts of these executors in the light of those which this popular exemplar of the homely virtues would be expected to perform when faced by the situation in which they were placed.

On the one hand, it was their duty to liquidate the assets of the estate. On the other, they owed an equal obligation to conserve the values of those assets and not to sacrifice them at an inadequate price. On this latter phase of the problem, *Matter of Thompson* (41 Misc. 420; affd., 87 App. Div. 609; affd., 178 N. Y. 554), which dealt with conditions in an earlier panic, said (at p. 421): " He may find among the assets of the estate that have come to his hands stocks of a somewhat dangerous and speculative character, subject to great and sudden fluctuations of value, which it is his duty to care for and dispose of, with all their inherent risks on the one hand *and possibilities on the other*. It is not the duty of the administrator at once to dispose of such assets without regard to the market, or the demand for them, or the ruling prices *or the possibility of an advance in their value*." (Italics not in original.)

Had the present executors sold in March, 1930, when, for the first time, they had the legal authority so to do, they would have sustained a heavy loss as compared with the prices prevailing at the time of the testator's death. If thereafter conditions had improved, these objectors would, no doubt, have been the first to cry that their rights had been wantonly disregarded. (Cf. *Matter of Winburn*, 140 Misc. 18, 23.)

This situation was not the result of the acts of the executors. These securities came from the testator and were not purchased by the fiduciaries themselves. This is an extremely important point to bear in mind. (*Matter of Clark*, 257 N. Y. 132, 136, and cases cited.) Furthermore the condition was one which affected

not only a single security but had impressed its results upon substantially all lines of industry and enterprise. Were the condition the reverse, a study of the single or few securities affected might furnish a solution of the problem whether it was the part of wisdom to sell or to await an anticipated improvement. No doubt the general adverse conditions affected the holdings of weaker securities sooner and in more pronounced fashion than it did those of a higher grade, but an improvement in general conditions would have a beneficial effect upon both the weak and the strong. The problem for study, therefore, became not one of the analysis of a few concerns or securities, but of general economic conditions throughout the world. Would these improve or would they not?

That these executors gave this question diligent and careful attention is reflected throughout the record. They constituted a somewhat unusually able group in this respect. There was James R. McCafferty himself, a mature business man, an important factor in a large and successful manufacturing enterprise, who had had long investment experience extending back to the days of the panic of 1907; the husband of his co-executrix was a man of affairs in a different line, also possessed of investment experience. Third, the group included the son-in-law of testator's other surviving daughter, who, while young, was in Wall Street and constantly in touch with the sentiment there prevailing. These men constituted an informal investment committee and conferred together a minimum of once a month and usually oftener on the subject of the proper course to be pursued. Each studied conditions through the medium of newspapers, financial publications and personal contacts with men of affairs and contributed to the general store of knowledge the information and opinions which they, respectively, had been able to acquire. Mr. McCafferty consulted with his bankers who, for years, had been his trusted advisers in such matters, and was told: " the opinion I can give you is what I know the Manufacturers Trust Company is doing in their trust department or custody department where they have authority to sell for different estates, is to stick tight and not sell." Similar advice was given him by men of affairs in different lines of industry in whose experience and judgment he had confidence. Mr. Meyers reported the result of a conference with Mr. Francis Sisson, vice-president of the Guaranty Trust Company, that " it was his thought that anybody that liquidated securities which they owned outright, was very foolish." By reason of his occupation, Mr. Kitching was constantly in touch with the statements and opinions of men who were highly considered in financial and industrial circles. Unquestionably, also, these men and many others were deeply impressed by the published

advice of the President of the United States "not to sell America short."

It is difficult to imagine anything which a "prudent man of intelligence in such matters" could or would have done which these executors did not do. Their decision, from the present viewpoint, appears to have been wrong, but under the circumstances here disclosed, the law will not penalize them for a lack of possession of the gift of prophecy. (*Matter of Clark*, 257 N. Y. 132, 136, 139; *Matter of Varet*, 181 App. Div. 446, 448; affd., 224 N. Y. 573; *Matter of Thompson*, 41 Misc. 420, 422; affd., 87 App. Div. 609; affd., 178 N. Y. 554; *Matter of Winburn*, 140 Misc. 18, 22; *Matter of Kent*, 146 id. 155, 161; *Matter of Beadleston*, Id. 548, 550.)

That history frequently repeats itself is clearly demonstrated by the language in *Matter of Weston* (91 N. Y. 502), in which the Court of Appeals refused to surcharge executors for acts almost identical with those demonstrated in this case. The opinion reads (beginning at p. 509): " Letters testamentary were granted on the 6th of June, 1873, and the judgment and discretion of the executors was then called into play, for it was possible to sell the stock at once for about 80. Should they do so, or wait, was the important inquiry, to be answered with sole reference to the welfare of the estate committed to their care. They consulted, and took the best advice attainable and determined to wait. The stock had been above par the year before, and under all the circumstances, with the advice and example of the testator both before them, and their own justifiable confidence in the value of the stock, it is quite certain that their conclusion was reasonable, and their delay excusable. As the stock continued to fall, the reason for waiting grew stronger to men who had confidence in its inherent value. After a delay of three months, came a panic in September. A storm of fright and distrust swept over the stock market, during which valuable securities were depreciated and sacrificed, and prices dropped suddenly and low. Certainly it was no time then to sell. The stock was paid for, and the estate strong and able to carry it through the unexpected emergency. If the executors had then lost courage, and, demoralized by the alarm around them, had thrown the stock overboard at 55, or less than its cost, it would have been easy to say that the trustees chose the worst possible time in which to sell, and acted from terror and not from judgment. And so they waited again, as prudent men similarly situated would have certainly done. The depression continued during the remainder of the year, but with symptoms of improvement in the early months of 1874. In February the recovery had brought the stock back to 67. At this point, it is said, the executors should

have sold; but while the price was better than that of the panic, it was little better, and still much below its value when originally received. It is easy to see now that it would have been wiser to have sold, and had the executors known then what they and we know now, they would undoubtedly have done so. But they did not and could not know. The indications pointed to an eventual restoration of value, and we cannot say that it was imprudent or unwise to expect and wait for it. But in April came another heavy fall, the stock dropping to 30, and in June of that year, when their inventory was filed, it was appraised at 20, although on the 14th of that month it was selling at 15. That is the history of the first year's holding by the executors. Facts are put in evidence showing the expectation and progress of a movement for consolidation; the persistent holding by one of the executors, through the same period, of stock of the same corporation owned by him individually; and the similar holding of much larger blocks by business men of acknowledged capacity and judgment."

On the facts herein disclosed, at least, the expert testimony on both sides carries no weight whatsoever. The test by which the conduct of the executors must be gauged is not whether or not some one, after the event, will assure the court either gratuitously or at so much per diem, that the executors, in their estimation, did or did not do the best thing which was possible under the circumstances. It is whether they conscientiously took advantage of the sources of guidance which were reasonably available to them and governed themselves accordingly.

The period covered by the account terminates on August 31, 1932, and the court exonerates the executors from any liability for continued retention of the securities in this estate during the period therein embraced.

In conclusion, two additional objections require a word of attention. The objection of the McCafferty contestants numbered 14 is predicated upon the theory that the executors have unduly retained the securities of the estate. In view of the adverse decision on this issue this objection must fail.

Ferguson objection No. 7, relating to the value of the McCafferty and Continental stock held in the estate, is premature. This will become important only when its sale or distribution takes place. The same applies to the value at which certain bonds distributed in kind shall be fixed. This is a question which is properly to be considered only on the final judicial settlement, which also applies to the question of the rights of the executors to commissions.

Except in so far as hereinbefore expressly sustained, all objections of both sets of contestants are overruled.

Proceed accordingly.