In the Matter of the Estate of FRANK W. CADY, JR., Deceased.
DOROTHY McCAULEY CADY, as Ancillary Executrix of the Estate of FRANK W. CADY, JR., Deceased, Appellant; FRANK W. CADY, SR., Respondent.

Fourth Department, January 7, 1925.

Trusts — investments — respondent and son, decedent, were joint trustees of trust for benefit of respondent with remainder over to decedent — original trust fund was properly invested — by agreement securities were left with respondent, and investments or changes therein were to be by mutual consent — respondent invested funds in speculative securities which were valueless — respondent is chargeable to estate of decedent with loss — evidence does not show consent by decedent — testimony of broker engaged to sell securities that son consented to investment is worthless.

The respondent, who was joint trustee with his son, now deceased, of a trust for the benefit of the respondent during his lifetime, with remainder to the son, will, on the judicial settlement of his accounts, be charged with the amount of the trust fund invested by him in worthless securities, where it appears that the funds were originally invested in proper securities, that the trustees agreed that the respondent should retain the securities and that investments should be made and remade by mutual consent, and that the respondent, in fact, was the active trustee in charge of the trust, and where it further appears that the respondent made no inquiry as to the corporate stock in which he reinvested the funds, but relied entirely on the assertions of the so-called broker engaged by the corporation to sell the stock.

The evidence by which the respondent sought to show that the decedent consented to and approved the investments in question was testimony given by the second wife of the respondent and by the so-called broker who sold the securities, both of whom were interested witnesses. The testimony of the so-called broker was absolutely worthless and will not be considered on the question of the consent or approval by the decedent. The testimony by the respondent's second wife to the effect that the decedent was willing to rely upon the judgment

of the respondent in making investments, is too vague to be of any material value.

The mere fact that the decedent, if it be a fact, deferred to the judgment of the respondent, his father, in reinvesting funds, does not amount to an approval, and the son's statement that if any loss occurred he would not hold the respondent's second wife responsible amounted to no more than a statement that if the respondent exercised reasonable diligence in making the investments, his wife would not be held responsible for losses.

Furthermore, giving the evidence its strongest weight, it is still insufficient to charge against the estate of the decedent a loss arising out of the investments in question.

APPEAL by Dorothy McCauley Cady, as ancillary executrix, etc., from a decree of the Surrogate's Court of the county of Monroe, entered in the office of said Surrogate's Court on the 21st day of March, 1924, judicially settling the accounts of Frank W. Cady, Sr., as trustee.

*Werner, Harris & Buck* [*Glenn L. Buck* of counsel], for the appellant.

*William W. Armstrong*, for the respondent.

DAVIS, J.:

Although the will is not printed in the record it appears that Mary E. Cady, deceased, created by her last will and testament a trust fund of $25,000, the income of which was payable to her husband, Frank W. Cady, during his lifetime, with the remainder to her son, Frank W. Cady, Jr. On February 20, 1918, a decree was entered in Monroe County Surrogate's Court settling the accounts of the executors of her estate.

The husband and son on that day entered into an agreement assenting to the decree, and consenting that $25,000 in stock and bonds be selected, to be held jointly by them and invested and reinvested in such manner as they might thereafter jointly determine, with the income therefrom payable to Frank W. Cady and the remainder payable to Frank W. Cady, Jr.

By another instrument dated the same day the parties selected certain securities for the trust fund, to wit, fifty shares of Southern Pacific at par, fifty shares of American Car and Foundry preferred at par, and real estate mortgages. The total aggregated $23,700 and to make up the difference between this sum and the capital fund, Frank W. Cady, Jr., agreed to contribute $1,300 in cash. They also agreed that the fund should be invested or reinvested in the name of either or both parties as should be thereafter determined, in such stocks or securities as might be by them jointly from time to time approved; and that the securities representing investment or reinvestment should remain in the possession of

Frank W. Cady until changed by mutual consent. They agreed to arbitrate in case they were unable to agree as to the custody of the securities or on other matters.

In January 1923, Frank W. Cady, Jr., died at Detroit, Mich., without having paid the $1,300 into the trust fund. There survived him a widow and infant son. On an accounting in Surrogate's Court by Cady as trustee, the son's widow as executrix contested the account.

The chief objection arose over investments that Frank W. Cady claimed to have made about 1919 to 1921 for the benefit of the estate in certain stocks known as " Tex-Lahoma Oil " and " Herschell-Spillman Motors," aggregating $12,325, which became worthless a short time after their purchase.

It appears that Frank W. Cady is a dentist and in 1919 and 1920 was investing his own funds in these stocks, which were unlisted on any market and apparently unknown and unheard of by persons making legitimate investments. The mortgages in the trust fund were being paid from time to time, and he had money from the trust estate available for investment. He also sold the Southern Pacific stock during this period. He bought some bonds which are apparently a sound investment, but he claims that a large portion of the trust funds that came into his hands were reinvested in these " wildcat " stocks, and asks that the loss shall fall, not upon him as the active trustee, but upon the widow and her infant son.

The duty devolving upon a trustee under such circumstances in making investments for the trust fund is well understood. He may, by statutory authority, without risk to himself, make certain investments. (See Decedent Estate Law, § 111, as amd. by Laws of 1918, chap. 544, and since amd. by Laws of 1922, chap. 593; Pers. Prop. Law, § 21, as amd. by Laws of 1918, chap. 544, and since amd. by Laws of 1922, chap. 599; Banking Law, § 239, as amd. by Laws of 1915, chap. 515; Laws of 1916, chap. 363; Laws of 1918, chaps. 95, 96, 270; Laws of 1919, chaps. 160, 647, and Laws of 1920, chaps. 717, 718, and since amd. by other statutes; Banking Law, § 239a, added by Laws of 1915, chap. 269, as amd. by Laws of 1920, chap. 701.) Beyond that, in making investments he is held to the duty to be faithful, diligent and prudent in an administration intrusted to him in confidence in his fidelity, diligence and prudence (*King* v. *Talbot*, 40 N. Y. 76, 84); and while he is not a guarantor of the safety of the securities in his charge belonging to the estate he is bound to exercise such prudence and diligence in the care and management of the estate as men of discretion and intelligence in general employ in their own like affairs. (*McCabe* v. *Fowler*, 84

N. Y. 314.) He must exercise sound discretion, as well as good faith and honest judgment. (*Matter of Hall*, 164 N. Y. 196, 200.) Failing in this duty and acting in contravention of principles which the law charges him to observe, he is guilty of constructive fraud, regardless of his motives or intentions (*Costello* v. *Costello*, 209 N. Y. 252), and becomes liable to the trust fund for the loss by reason of the investment. (*Matter of Stark*, 15 N. Y. Supp. 729.) His duty is not discharged when he has taken securities but he must be actively vigilant to ascertain whether or not the investment is unsafe and insecure and constantly growing more so; and for want of reasonable care in that respect he is chargeable for the losses caused by depreciation. (*Villard* v. *Villard*, 219 N. Y. 482.) If respondent invested the trust funds in these stocks, he neither acted originally in good faith in the exercise of sound discretion, nor after he obtained them with reasonable care in protecting the estate against loss. He admits that he made no inquiry concerning the stocks before their purchase, except from the man who was employed to sell them; and it does not appear that he made any inquiry afterward as to their value or future security.

The trustee seeks to exonerate himself from liability by a claim that his son consented to these investments. The evidence is furnished by one Palmer, who sold him these worthless stocks, and by Cady's second wife. Both were interested witnesses. Palmer seems to belong to a well-known class of " brokers " who, by appealing to their credulity and avarice prey upon those financially ignorant. It is inconceivable that any juror or person of practical experience would have believed a word of his material testimony. As to that of the other interested witness, it was too vague and indefinite to warrant the conclusion that the son definitely approved these investments. The case was decided at the close of the evidence in an oral opinion. Had the learned surrogate read the evidence after it had been transcribed, instead of relying upon his impressions and memory, I cannot believe he would have reached the same conclusion.

At the time it is claimed these " investments " were made, the son was living in a distant city, returning only for occasional visits. The evidence of Palmer is that on one of these occasions about November, 1921, he talked with the young man in his father's office about Tex-Lahoma, the condition of the company and the wisdom of making investments in it, and that the son said he considered it was good; " that he left it all up to his father." That on another occasion, the date of which is not given, he talked with him about Herschell-Spillman, and the son seemed very

familiar with the motor industry and said he wanted to sell his Kodak stock and buy an interest in a local firm (not Herschell-Spillman); and that the son did not seem to be familiar with Herschell-Spillman but with the "probabilities of the motor industry." Nothing was said about his father's making investments on that occasion. In neither case did the son assume to know anything about the stocks except what the "broker" told him.

Mrs. Cady's evidence on this subject in reply to somewhat leading questions, was that she could not recollect whether there was more than one conversation between the young man and his father on his visits home, but she thinks there was "one or two; two or three times they spoke of those things before me." Then follows: "Q. Is there one that you remember better than the other, you mean? A. Yes, I do. Q. Tell us, if you please, what you remember as to the substance of what was said by each of them on that occasion? A. Well, I remember Doctor Cady one evening asking Frank if he would have — of course this is rather vague in my mind except that he — Frank — everything that Doctor spoke or suggested of to him he said 'it was all right;' he didn't seem to want to have anything to do with this money that the Doctor had during his lifetime — he wanted — Frank, Junior, wanted the Doctor to have the whole charge of it. Q. Do you remember of their speaking of — on that occasion that the topic of conversation was some of these investments that Doctor had made? A. Yes, I remember that. Q. Do you remember which of them it was that were spoken of? A. These oil stocks. Q. These Tex-Lahoma oil stocks? A. Yes. Q. Was there anything else that you remember in that conversation on the subject, Mrs. Cady; was that about all that you remember of? A. Why, yes; I just remember that Frank wanted his father to do whatever he pleased with it; he would have nothing to do with these things. Q. Were there any other occasions when you have any more distinct recollection of what was said? A. Well, I remember one evening when Doctor said to Frank if he should lose any money; I remember that very distinctly; he turned to Frank and said, 'Frank, if I should lose any of that money you cannot expect Eleanor [witness] to make it good;' and he said, 'No, father, I don't expect Eleanor to make it good.'"

Her further testimony on the subject was that whatever the doctor did, Frank considered perfectly all right, and in fact he would have nothing to do with it.

Taken literally, these conversations in my opinion would mean nothing more than that a young man, unable even to pay the

$1,300 he had agreed to pay into the trust fund, with no knowledge of investments, was deferring to the judgment of his father and permitting him to be the active trustee, relying upon his fidelity and diligence; and if he exercised reasonable diligence he would not require his stepmother to make good any loss.

But if the literal meaning might be different, the evidence still falls far short of what is required to charge against the estate of a deceased person a claim which is based upon the testimony of interested witnesses. The rule is very definite that " Public policy requires that claims against the estates of the dead should be established by very satisfactory evidence, and the courts should see to it that such estates are fairly protected against unfounded and rapacious raids." (*Matter of Van Slooten* v. *Wheeler*, 140 N. Y. 624, 633.) Otherwise stated, " Public policy required that his claim against the estate * * * should be established by very satisfactory evidence, and it was the plain duty of the surrogate, in the absence of such proof, to reject it." (*Matter of Marcellus*, 165 N. Y. 70, 76.) While the agreements of a deceased person may be established by a fair preponderance of parol evidence of his admissions, " in applying the rule and test to specific evidence, however, it very likely will and should occur that the triers of fact will more carefully and critically scrutinize evidence offered against a dead person's estate for the purpose of deciding whether it does make the necessary weight and preponderance of evidence, than would be done if the testimony was offered against one who was alive to contradict it." (*Ward* v. *New York Life Ins. Co.*, 225 N. Y. 314, 322.)

I think, as I have already said, that we may reject the evidence of Palmer as entirely untrustworthy. The respondent's claim, therefore, rests upon the vague and uncertain testimony of his second wife. It is not enough to turn the scale in his favor. (*Scheu* v. *Blum*, 119 App. Div. 825.)

The evidence given was contradicted by circumstances. Cady, Sr., was by agreement awarded custody of the fund. New investments were to be made by consent of both, or disagreeing, by arbitrators. If we may say that the evidence warrants the conclusion that the son waived the terms of the written agreement and deferred to his father's judgment in making investments, we should not be led further to believe he approved these particular investments of which he knew nothing. Respondent, evidently one who believes that an investment is something that pays abnormally high rates of interest and promises excessive profits, was investing his own money in these worthless stocks, relying upon the glowing and plausible representations of Palmer. The ordinarily prudent man, exercising

sound discretion, would not sanction such a policy. Evidently when money was paid in on the mortgages, he took trust funds and invested them also for his own profit. It appears that at no time that he claimed to have made investments for the estate in these stocks did he invest either exactly or approximately the sums available in the trust fund, but paid in money of his own and had the stock certificates issued in his own name. These facts lead to the conclusion that only after he suffered loss by the collapse in values and his son was dead, was his mind invaded by the thought that he could protect the interests of himself and his second wife, by charging these losses to his son's widow and her little son. The decision, if not erroneous as a matter of law, is against the weight of credible evidence.

Under no pretext whatever may trust funds be used for engaging in wild speculation or for the trustee's individual benefit. To so use them is illegal and constitutes a *devastavit*, and the funds may be reclaimed not only from the trustee but from any one receiving them with notice. (*Debold* v. *Oppermann*, 111 N. Y. 531; *Moore* v. *American Loan & Trust Co.*, 115 id. 65; *Matter of Myers*, 131 id. 409; *Steele* v. *Leopold*, 135 App. Div. 247; conditionally modified, 201 N. Y. 518.)

A finding of fact should be made in this court to the effect that the son did not consent to the investment in the stocks in question; and the matter should be remitted to the surrogate with directions to resettle the account, disallowing the items in dispute and charging the trustee with the loss, but crediting him with the sum of $1,300 with interest thereon from February 20, 1918.

HUBBS, P. J., CLARK, CROUCH and TAYLOR, JJ., concur.

Decree reversed on the law and facts and matter remitted to the Surrogate's Court, with directions to resettle the account in accordance with the opinion, disallowing the items in dispute and charging the trustee with the loss, but crediting him with the sum of $1,300, with interest thereon from February 20, 1918. This court makes a finding of fact that Frank W. Cady, Jr., did not, in his lifetime, assent to the investment of the trust funds in the capital stock of the " Tex-Lahoma Oil Company" and " Herschell-Spillman Motors."