Alexandra R. STARK, Wendy R. Powell, Mary R. Roessler, Helene R. Epifano, and Henry Bullard, as guardian ad litem on behalf of the infant and unborn remainder beneficiaries of four inter vivos trusts established by Deed of Henry H. Rousseau, dated April 29, 1965, Plaintiffs,

v.

UNITED STATES TRUST COMPANY OF NEW YORK, Defendant.

No. 76 Civil 1694.

United States District Court, S. D. New York.

Jan. 5, 1978.

Pollack & Kaminsky, New York City, for plaintiffs; Daniel A. Pollack, Richard M. Asche, Neil D. Thompson, New York City, of counsel.

Carter, Ledyard & Milburn, New York City, for defendant; John M. Walker, Jr., Richard B. Covey, Dan T. Hastings, Richard G. Moon, Arthur P. Lowenstein, New York City, of counsel.

## OPINION, FINDINGS OF FACT AND CONCLUSIONS OF LAW

EDWARD WEINFELD, District Judge.

On April 29, 1965, the late Henry Harwood Rousseau created four inter vivos trusts (the "Trusts") for the benefit of each of his four daughters and their descendants (the "beneficiaries"). Named as Trustee in each of the Trusts was the defendant, United States Trust Company of New York ("USTC" or the "Trustee"). Plaintiffs, the beneficiaries, brought this action to recover losses incurred in the Trusts, allegedly the result of defendant's lack of prudent management.[1] Their charges center about defendant's retention in the Trusts of shares of stock in Clorox Co. ("Clorox"), Evans Products Co. ("Evans") and Coleco Industries, Inc. ("Coleco"), and their basic contention is that at an undetermined and unspecified time[2] following the death of the settlor in February 1972, USTC should have sold these stocks. Resisting plaintiffs' charges, the Trustee contends that in retaining these holdings it acted in good faith, exercised its judgment in a reasonable manner and measured up to the standard of prudent conduct imposed upon fiduciaries.

During the course of a five-day trial, defendant moved to dismiss the claim at the close of plaintiffs' case and renewed the motion at the end of trial; decision was reserved in each instance. Upon a word-by-word reading of the trial transcript, a review of the Court's trial notes, appraisal of the trial witnesses—particularly defendant's employees in charge of the trust accounts, whose testimony the Court finds credible—and a study of various exhibits, the Court concludes upon the totality of the entire record that the charge of fiduciary breach by the Trustee has not been sustained and accordingly judgment on the merits is granted in favor of the defendant. We reach this conclusion whether the standard of conduct applied is that of the "prudent man"[3] or, as the plaintiffs here urge, a higher and more rigorous standard to be applied to professional fiduciaries who advertise their special skill and qualifications.[4]

### I

**A. The Trusts and Their Funding.**

Under the terms of each Trust agreement, which for purposes relevant herein

---

1. The complaint originally contained three counts. Counts I and III, dealing with claims against the defendant as executor and testamentary trustee under Rousseau's will and alleging improper distribution of estate assets, were dismissed on November 4, 1976. This Court has jurisdiction of the remaining claim by virtue of the diversity of citizenship of the parties.

2. At the close of trial, in response to the Court's question of when the three stocks should have been sold, plaintiff's counsel stated:

> I think to pin that point would be very difficult. I think that the question really is not an answerable one in this sense. I don't think there was any single day on which we would say they must have sold them . . . .

3. See, e.g., Matter of Bank of New York, 35 N.Y.2d 512, 518–19, 364 N.Y.S.2d 164, 169, 323 N.E.2d 700 (1974); Matter of Clark, 257 N.Y. 132, 136, 177 N.E. 397 (1931); King v. Talbot, 40 N.Y. 76, 84–85 (1883).

4. See text accompanying notes 33 and 34 infra.

are identical, the daughter for whom it was created and her issue may receive income and/or principal in the "absolute discretion" of the Trustee during the Trust term. Upon termination, a Trust's property is to be distributed to the daughter's surviving issue, *per stirpes,* or if none, to other designated remaindermen. Each Trust runs until twenty-one (21) years after the death of the last surviving daughter.

Rousseau's apparent objective was long term capital appreciation for the Trusts' duration and the considerable discretion vested in the Trustee was presumably designed to accomplish this. Thus, in addition to the Trustee's discretion with respect to payment of income and principal, paragraph the Third of each agreement, which outlines the Trustee's powers, specifically provides that the powers are to be construed in the "broadest possible manner." Subsection (1), relevant herein, in substance empowers the Trustee, in its absolute discretion, to retain in the Trust any property received from the settlor, regardless of whether the Trust is invested disproportionately in such securities and provides that the Trustee shall neither be liable nor subject to surcharge or criticism for loss of income or principal caused by such retention or on the ground that such retained securities constitute an excessive portion of the Trust.[5]

The three stocks in question, Clorox, Evans and Coleco, were included in the Trusts'

portfolios by direct gift or upon Rousseau's initiative. It is clear that he regarded these as desirable investments for the Trusts' purposes as he had been interested in the affairs of these companies and was familiar with the management of each. All were listed on the New York Stock Exchange. In addition to these securities, the Trustee purchased additional securities on its own initiative. During Rousseau's lifetime and up to the date of his death the estate appreciated substantially; some securities, including Evans, were sold by the Trustee over Rousseau's objections and considerable profits were realized.[6] When Rousseau died in February 1972, each Trust contained 1000 shares of Clorox common stock, 2,002 shares of Evans common stock and 2,211 shares of Coleco common stock, valued at approximately $940,000. By January 1975, the total value of the three stocks had dropped to $93,000. Essentially, defendant's administration of the Trusts during the period following Rousseau's death in 1972 is the focus of this dispute.

B. Defendant's Handling of the Trusts.

Within defendant's investment division, which deals with inter vivos trusts such as those in question, a number of sub-groups perform various functions. The Investment Policy Committee ("IPC") predicts broad economic trends, evaluates the market environment and makes general recommendations on portfolio strategy.[7] The Stock Se-

**5.** Subsection (1) provides that the Trustee has:
Power to retain for such period as it shall deem proper any property received in trust hereunder, be it at the creation of the trust or by way of addition at a later date. Without limiting the absolute discretion of the Trustee, it shall be authorized to retain for such period as it shall deem proper any stocks, bonds or other securities, including voting trust certificates, conversion or subscription rights, warrants and/or options received in trust hereunder at the execution of this indenture, or by way of addition at a later date, of Moore's Super Stores, Inc. or any successor corporation [later Evans], or of any other corporation, and to exercise any and all rights and privileges accorded to it as the holder thereof as it, in its absolute discretion, deems to be in the best interest of the trust, and to purchase by subscription, exercise of

conversion or subscription rights, warrants and/or options, or otherwise additional securities of any such corporation, even to the extent that the trust concerned may be invested largely or entirely in such securities. The trustee shall not be held liable for loss of principal or income caused by the retention of such securities nor shall it be subject to criticism or surcharge upon the ground that said securities constitute an excessive portion of the trust.

**6.** *See* note 13 *infra.*

**7.** The IPC, made up of senior USTC officers, including the chief economist, the head of the investment division and senior group and department heads, meets regularly and publishes its opinions, known as Investment Policy Statements, at least monthly.

lection Committee ("SSC") follows a universe of approximately 300–500 stocks (of a total 2500 held in one or more of the Company's portfolios) and codes these stocks with symbols suggesting [8] to those dealing directly with the portfolios the SSC's judgment of that stock's prospects and an appropriate course to take with respect to its purchase, sale or retention.[9] Both the SSC and the IPC rely upon the Trustee's research department and analysts therein, which provide reports on both whole industries and a specific company within an industry if that company is coded by the SSC, and upon the research library, which contains files on approximately 1600 companies and is kept current.

The actual responsibility for the day-to-day handling of customer accounts, however, rests with the portfolio manager (the "PM"). The PM makes the actual decisions for purchase, retention or sale of any security in a portfolio and is charged with keeping abreast of developments in the stocks and industries represented in an account. External and internal sources provide the information: externally, the Wall Street Journal, other business periodicals, securities ratings services, company publications, quotrons and current tickertape are available. Internally, research department reports, the IPC's economic forecasts and, where available, the SSC's decisions provide guidance to a PM. When a stock is not carried in the coded universe of SSC stocks,

a PM has the additional responsibility of staying current on each non-coded company carried in a portfolio handled; no internal analyses can be relied upon to help synthesize all the relevant information. However, using outside sources of information—periodicals, outside research firms' analyses and publications of the followed company itself, all of which are in library files—the PM reaches a decision.

Since the fall of 1966, except for a brief period in late 1969 to early 1970, the Trustee's PM assigned to the Rousseau Trusts was Karen A. G. Loud, a woman with considerable professional credentials,[10] assisted after the fall of 1970 by Kathy O. Leonard. Rousseau's relations with Loud were cordial and cooperative—indeed, Loud's resumption of responsibility for the Trusts in 1970 was at Rousseau's request, he being of the view that Loud better understood the Trusts' objectives than had her replacement.

The Rousseau portfolio was reviewed more often than was required by USTC policy. Prior to each visit by a member of the Rousseau family, the account was examined and the holdings evaluated for continued suitability. Similarly, each time an event of significance took place in any of these investments, that company's securities were reevaluated. Moreover, USTC was also co-executor of Rousseau's estate which contained substantial investments in these three companies, and Loud and Leon-

---

8. The code is intended solely as guidance and is in no way a directive.

9. The SSC is composed of senior research analysts, senior portfolio managers and members of the economics department. Among the possible codings given stocks were and are: (a) "P", standing for "purchase", indicating SSC judgment that the stock is approved for purchase in all accounts; (b) "HS", standing for "hold for sale," which applies where in the SSC's opinion long term prospects are such that the stock should not have a continuing place among long term holdings, but where circumstances—including a price overly depressed relative to the perceived near term potential of the stock—make prompt sale inadvisable; (c) "CS", standing for "consider switch," which is a recommendation for reduction or elimination of holdings in favor of stocks with superior prospects; and (d) "thin,"

which when added to any of the above codes indicates limited marketability of a particular stock and thus possible problems in executing orders concerning that stock.

10. Loud, a graduate of Radcliffe College and the Harvard-Radcliffe Business Program, is presently a Vice President of USTC, a member of the Radcliffe Board of Trustees, and Chairperson of the Finance Committee of that Board, which Committee has responsibility for the Radcliffe College Endowment Fund of approximately $35,000,000. She is also Treasurer and Trustee of a non-profit corporation having an endowment of $14,000,000, which receives and holds property for Episcopalian churches in New York. She joined USTC in 1961 after three years' experience at Chase Manhattan Bank, where her functions included financial analyses of corporations for credit purposes.

ard repeatedly met with the portfolio manager assigned to the Rousseau estate and the account would be reviewed prior to and during these discussions. In all, the Trusts were reviewed by Loud and/or Leonard on more than forty occasions from 1972–75.

Concededly, USTC's forecasts of the economic climate for the period of 1972 through 1975 were not 100% accurate; its predictions concerning the course of the economy and stock market were not fully realized. For example, in November 1972, the IPC predicted that economic expansion would continue through 1973 and into 1974 and there would be no recession, when in fact the economy underwent a dramatic slowdown at that time. In May and June of 1973, the IPC cautioned the portfolio managers that stocks should not be sold to raise cash "in periods of market weakness." Perhaps most importantly, despite the economic slump, the IPC was of the opinion that the market had overly discounted equity securities and continued to recommend investment therein, especially in "quality growth stocks" with "proven ability to generate and maintain above-average and consistent profitability and growth in earnings." However, the Trustee explains, a number of factors affecting the economy were unforeseen and for the most part unforeseeable: the Arab oil embargo, inflation, consistently high interest rates, decline in discretionary purchasing power and the effects of Watergate, to name a few. Nevertheless, these basic forecasts guided Loud and Leonard in their Rousseau portfolio decisions.

1. *Clorox.* Clorox was and is America's largest manufacturer and supplier of household bleach products. It had been acquired by Procter & Gamble Co., but was divested in 1968 as the result of an antitrust decree.[11] With management trained by Procter & Gamble, the fledgling Clorox em-

barked upon a diversification program designed to alter the company's one product status. Among its early acquisitions was Grocery Store Products Co., one of the companies in which Rousseau manifested a special interest and whose stock he contributed to the Trusts in contemplation of the acquisition. Aggressively pursuing this diversification policy, a number of other corporate entities were acquired.[12]

These acquisitions and indeed Clorox itself were the subject of considerable attention in the financial press and by different research analysts. Earnings reports and financial statements were carried in the Wall Street Journal. The thrust of the analyses in most instances was that although it was too early to tell definitively, Clorox's acquisitions appeared to be in furtherance of its diversification policy. Although some reports felt that investor caution was warranted, the analysts' general impression of Clorox was favorable. Despite this and the acquisitions, the market price of Clorox dropped steadily from a peak high of 51 in January 1973, to a low of close to 5 in the latter part of 1974. However, at the time of trial, Clorox's price had risen to 13 per share.

Clorox was not coded by the SSC—a fact which has a number of consequences and implications. One of them, however, is not a judgment on the part of the SSC that Clorox was not an attractive investment opportunity. It does mean that a PM with Clorox in a portfolio received no guidance from the SSC and no internal, i. e., prepared at USTC, research analysis. A PM could, however, rely upon information compiled by the research department kept in the USTC library's Clorox file, which contained analyses prepared by outside analysts and corporate reports and releases both of Clorox and its subsidiaries.

---

**11.** *See FTC v. Procter & Gamble Co.*, 386 U.S. 568, 87 S.Ct. 1224, 18 L.Ed.2d 303 (1967).

**12.** These included: (a) Martin-Brower Corp., a supplier of products and services including disposable packaging items and non-perishable foods in March, 1972; (b) Hidden Valley Ranch Food Products, Inc., which makes salad dressings and party dips, in November 1972; (c) Right Away Foods Corp., a producer of convenience food products for the food service industry, in October 1972; and (d) Kingsford Co., a manufacturer of charcoal briquettes, in March 1973.

Loud and Leonard made use of these files in determining on numerous occasions after Rousseau's death that Clorox was suitable for retention in the Trusts. Loud read each of the reports in the files, possibly read others, and followed the considerable coverage given Clorox, its acquisitions and financial condition in the press. She was aware of Clorox's plan for diversification and in 1972 regarded the company as a good growth situation. She was aware of the early 1973 market decline in Clorox, but nevertheless reached the judgment that the problems Clorox faced largely concerned its absorption of its acquisitions, were non-recurring and temporary, that the stock was undervalued in the market and that the decline was an overreaction to the news of a drop in earnings—a judgment shared by outside analyses appearing at that time. She later noted the favorable analyses given Clorox despite its drop in market price and on the basis of reports and earnings projections concluded that there was a good prospect of price improvement since the stock was selling at an historically low price-earnings ratio and the price had declined more than events would warrant. A company report in the spring of 1974 that earnings would increase seemed to confirm Loud's judgment, shared by many·analysts, that Clorox's were growing pains and that improvement was forthcoming. Although that proved not to be entirely true and the projection was not met (resulting in a drop to 5 in Clorox's market price), Loud held to the belief that the stock should be retained, for based on available reports, on a value basis in the market, sale would be unwise.

Although some of the stock was sold from all of the Trusts in 1973 and 1974, and all of it was sold from one of the Trusts in 1976, there remain 1,320 shares·in each of three of the Trusts.

2. *Evans.* Evans was a major manufacturer of prefabricated housing, a substantial producer of lumber, building materials and a variety of products used by the railroad and mobile home industries and had a retail outlet division selling home improvement and hardware materials. Like Clorox, Evans stock's inclusion in the Trusts resulted from Rousseau's gift to the Trusts of shares of a company in which he had been especially interested and which he knew was about to be acquired by a larger concern.[13] Also like Clorox, its stock suffered a sharp decline in price from 23⅛ when Rousseau died to 3 in January 1975. Unlike Clorox, however, Evans was both followed by a research analyst and coded by the SSC.

In January 1972, prior to Rousseau's death, the SSC coded Evans "HS"—hold for sale.[14] Although the housing industry, which greatly affected Evans' performance,[15] had performed well and the Committee expected additional upward movement, it felt that *adding* to Evans' holding was inadvisable. On two occasions that spring, Loud decided that Evans should be retained, at least for the time being. On January 31, 1973, Evans' HS rating was reaffirmed, reflecting the SSC's view that the holding was questionable for the longer term, but that reduction in holdings should be temporarily deferred in anticipation of moderate price appreciation. During the

13. Rousseau funded each Trust with 2,000 shares of Moore's Super Stores, Inc. ("Moores"). On December 9, 1965, 1534¾ shares of Evans cumulative preferred were received in each Trust in exchange for the Moores stock. Of this, 400 shares were sold in 1966, 400 in 1967, 364 converted into common stock of $5.00 par value and sold in 1968, and the remainder converted into common stock of $1.00 par value in 1971. Thus at Rousseau's death, only approximately one-quarter of the initial Moores-Evans holdings remained.

14. *See* note 9 *supra.*

15. Because Evans' earnings were largely obtained from the forest products and housing

industries, they were subject to wide fluctuations. Both industries, and especially the latter, are cyclical and tied to the economy; thus predicting performance of the housing industry in the economic environment is essential to effectively determining one's course with a company involved therein. Although a significant percentage of Evans' income was not in building or building·materials, and in fact it was the company's program through diversification to minimize cyclicality as much as possible, enough was still so related to cause the stock to be especially sensitive to changes in the economic environment.

year and prior to a number of meetings with the beneficiaries, Loud reviewed the holdings and decided to retain the Evans stock.

In March 1974, the analyst assigned to Evans recommended that the SSC rating be changed to "CS"—consider switch [16]—but the SSC, in its coded suggestion for the PM, rejected this recommendation and reaffirmed the HS code, for despite the fact that the stock had suffered a 40% decline in price, the SSC believed that it was overly depressed at that point and that Evans was experiencing a "better environment" which the stock's price would soon reflect. Again, in May 1974, Loud determined that Evans should not be sold.

An August 1974 Evans' announcement that their operations during the second half of the year would only reach break even was a disappointing surprise to those following the company, both at USTC and elsewhere. A complete report on Evans was prepared and on November 20, 1974, the SSC recoded Evans "CS". As Evans had been one of the primary contributors to the Trusts' income via sizeable dividends regularly paid, the fact that a dividend had been passed was significant and by December 31, 1974, Loud and Leonard agreed that Evans should be put on the market at some point. On January 17, 1975, the Evans stock was sold.

3. *Coleco.* When Rousseau died, Coleco was the largest American manufacturer of above ground swimming pools. The Trusts' stock was purchased by USTC at Rousseau's urging; he had become interested in it because of prior business associations with the company's chief executive officer. When the stock was purchased in early 1966, Coleco basically produced one item— swimming pools—providing it with only seasonal income. Its plans, known to and apparently approved by Rousseau, however, were to diversify Coleco's operations and by

adding additional lines, reduce the seasonality of its income and provide a more efficient use of capital and equipment.

Like Evans, Coleco was an SSC coded stock. At Rousseau's death, with the stock trading at 57⅛, the SSC's coding for Coleco was "P-thin"—purchase under certain conditions.[17] The rating was reaffirmed on May 3, 1972 following Coleco's acquisition of a snowmobile manufacturing concern. Although recognizing the difficulties and uncertainty of the acquired line, Ms. Loud determined to retain the holdings based on the explanations offered at a Coleco meeting for securities analysts held in May or June of 1972.[18] Shortly thereafter, the stock split 2 for 1. On each of the additional reviews that year, the same retention determination was reached. Again, in early 1973, the "P" coding was reaffirmed, despite recognition by the SSC that the snowmobile and toy industries were having problems and that Coleco had both these lines.

On July 31, 1973, however, Coleco's coding was changed to "HS"—hold for sale— "based on a revision of [the SSC's] fundamental view of the Company." Poor weather and rapid increases in interest rates had hampered earnings. Moreover, as a result of the diverse assets acquired, the market's impressions of Coleco and those of the USTC had changed substantially and "a lasting disenchantment with Coleco's acquired product lines was indicated." However, as it believed the stock's price to be overly depressed, the SSC recommended that the stock be held for sale at a future, hopefully higher price. This reappraisal was reaffirmed on November 2, 1973. As explained to the beneficiaries by letter soon after, the stock was retained in the judgment that the then current market price did not reflect an appreciation for Coleco's overall record. Again the HS rating was reaffirmed on April 19, 1974, based on the SSC's judgment that problems in the com-

16. See note 9 *supra.*

17. See note 9 *supra.*

18. The Coleco management explained that this line's seasonality complemented that of the

pool business, the snowmobiles added to the diversity of Coleco's operations, the acquisition was at a good price and the acquired company's plants were located well in terms of Coleco's own expansion plans.

pany had been corrected and that market circumstances, until then unfavorable, would improve, thus bringing a better market price. Coleco was discussed at a May 22, 1974 meeting with two of the beneficiaries, one of whom had recently attended Coleco's annual meeting; following that meeting Loud again determined that the stock should not be sold. Similarly, at a December 31, 1974 meeting, it was decided that the stock was overly depressed (trading at 1⅝) and should be held for sale at a better price. The HS rating was reaffirmed by the SSC on May 23, 1975 and again on April 13, 1976. Each Trust still has the Coleco stock, which at the end of 1976 traded at 5¼.

In sum, the market price of each of the stocks described above suffered dramatic losses from the peaks reached near the time of Rousseau's death. Each was a fairly young company embarked on a program of diversification and acquisition. All were received in the Trusts from or in connection with Rousseau. Two, Evans and Coleco, were coded by the SSC and followed by USTC research analysts; Clorox was not, but was under the constant supervision of Loud and received considerable attention from outside research analysts and the financial press, all of which came to her knowledge. Finally, all the Trusts still have Coleco, none have Evans, and three retain Clorox.

## C. Plaintiffs' Contentions.

Plaintiffs, citing the sharp drop in market price and the extensive changes undergone by these companies, argue that the Trustee was negligent and failed to meet its fiduciary responsibilities. More specifically, plaintiffs argue that USTC was negligent with respect to Clorox in that: (a) no internal research or analysis of any sort was done by any USTC employee, Loud included; (b) Clorox was not followed by

the Research Department or coded by the SSC but was followed solely by Loud; and (c) although Loud testified to having read the library's Clorox file, the financial press coverage and other outside reports on Clorox, (i) there is no indication in the files such as a memorandum or note from Loud that in fact she read them; (ii) she never attended a Clorox shareholders meeting, an analysts meeting on Clorox or actually spoke with Clorox management or an outside analyst about Clorox; and (iii) even if in fact she did read the library files, there are no reports therein dated between March 1972 and April 1973 and therefore Loud was uninformed about Clorox at that time.

Plaintiffs find imprudence in the Trustee's retention of Evans in that: (a) Rousseau was a director of Evans and his death deprived USTC of an important source of information;[19] (b) Evans was coded HS for over three years in violation of USTC's own internal policy; and (c) the analyst following Evans had recommended a change of code to CS in March of 1974, which Loud knew about and which was rejected by the SSC, the latter recoding the stock in November of that year after the stock's price became still more depressed.

Finally, as for Coleco, plaintiffs charge that: (a) the company's acquisition policy did not manifest itself until after Rousseau's death, thus removing any influence his support of the company might have had on retention decisions; (b) the SSC recoding of Coleco in July, 1973, from P-thin to HS based on a "revision of [its] fundamental view of the company" should have been made earlier in view of the price decline; and (c) the Trustee improperly failed to sell Coleco, still coded HS, despite other negative analyses and evaluations of Coleco and the industries it was in. In short, plaintiffs charge that the defendant failed to follow Clorox at all, did no comprehensive or in depth study of Evans or Coleco, ignored

---

**19.** *But see* Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5 thereunder, 17 C.F.R. § 240.10b–5.

warning signs in Evans and Coleco, and failed to closely follow fundamental changes in each company. Finally, plaintiffs charge that the Trustee failed to diversify the portfolio or employ the assets of the Trusts profitably.

The Trustee responds that the record discloses that each of the securities was closely and carefully followed by the designated PM; that the decision to retain or to sell at a given time was made in the exercise of a good faith and prudent judgment based upon existing and reasonably projected economic factors—in sum, that plaintiffs' are now applying a hindsight judgment rather than viewing its conduct as of the time of the occurrence of events and against the background of existing conditions.

## II

### A. The Legal Standards.

■ In the substantial body of New York law governing the duties and responsibilities of trustees and applicable herein,[20] a number of fundamental principles have evolved which are relevant to and determinative of the issues in this case. It is clear that a trustee is neither insurer nor guarantor of the value of a trust's assets.[21] A trustee's performance is not judged by success or failure—i. e., right or wrong[22]—and while negligence may result in liability, a mere error in judgment will not.[23] Neither prophecy nor prescience is expected of trustees[24] and their performance must be judged not by hindsight but by facts which

20. Article Eight of each Trust agreement provides:

This indenture and the property described in Schedule "A" hereto annexed are delivered to and accepted by the Trustee in the State of New York. The trust hereby created shall be a New York trust and shall be administered in accordance with the laws of the said State. This indenture shall be construed and the validity and effect of the provisions hereof shall be determined in accordance with said laws.

21. McCabe v. Fowler, 84 N.Y. 314, 318 (1881); Matter of Cady, 211 App.Div. 373, 207 N.Y.S. 385, 387 (4th Dep't 1925); In re First Nat'l Bank, 25 N.Y.S.2d 221, 224 (Sup.Ct. N.Y. County 1941); Matter of Cuddeback, 168 Misc. 698, 6 N.Y.S.2d 493, 495 (Sur. Ct. Orange County 1938); Matter of Lather, 137 Misc. 226, 234, 243 N.Y.S. 366, 376 (Sur. Ct. Westchester County 1930).

22. Matter of Clark, 257 N.Y. 132, 136, 177 N.E. 397, 398 (1931) ("it is impossible to say that trustees are wanting in sound discretion 'simply because their judgment turned out wrong,'" quoting Green v. Crapo, 181 Mass. 55, 58, 62 N.E. 956, 957 (1902) (Holmes, J.)); Matter of Cowles, 22 A.D.2d 365, 255 N.Y.S.2d 160, 173 (1st Dep't 1965), aff'd, 17 N.Y.2d 567, 268 N.Y.S.2d 327, 215 N.E.2d 509 (1966); Matter of Kellogg, 35 Misc.2d 541, 230 N.Y.S.2d 836, 845 (Sup.Ct. Erie County 1962); Matter of Pate, 84 N.Y.S.2d 853, 866 (Sur.Ct. N.Y. County 1948), aff'd, 276 App.Div. 1008, 95 N.Y.S.2d 903 (1st Dep't 1950); Matter of Balfe, 152 Misc. 739, 274 N.Y.S. 284, 293 (Sur.Ct. Orange County 1934), aff'd, 245 App.Div. 22, 280 N.Y.S. 128 (2d Dep't 1935); Matter of McCafferty, 147 Misc. 179, 264 N.Y.S. 38, 66 (Sur.Ct. Kings County 1933); Matter of Kent, 146 Misc. 155,

261 N.Y.S. 698, 702 (Sur.Ct. N.Y. County 1932), aff'd, 284 N.Y.S. 976 (1st Dep't 1935); see Costello v. Costello, 209 N.Y. 252, 264, 103 N.E. 148, 153, (1913) ("All men of honesty, prudence and enlightenment do not think alike."); Matter of Morgan Guaranty Trust Co., 89 Misc.2d 1088, 1090, 396 N.Y.S.2d 781, 784 (Sur.Ct. N.Y. County 1977) ("[T]he test to be applied is one of conduct rather than performance . . .").

23. Matter of Bank of New York, 35 N.Y.S.2d 512, 519, 364 N.Y.S.2d 164, 169, 323 N.E.2d 700 (1974); Matter of Clark, 257 N.Y. 132, 137, 177 N.E. 397 (1931); Costello v. Costello, 209 N.Y. 252, 261, 103 N.E. 148 (1913); Matter of Pate, 84 N.Y.S.2d 853, 866 (Sur.Ct. N.Y. County 1948), aff'd, 276 App.Div. 1008, 95 N.Y.S.2d 903 (1st Dep't 1950); In re First Nat'l Bank, 25 N.Y.S.2d 221, 225 (Sup.Ct. N.Y. County 1941); Matter of Balfe, 152 Misc. 739, 274 N.Y.S. 284, 294 (Sur.Ct. Orange County 1934), aff'd, 245 App.Div. 22, 280 N.Y.S. 128 (2d Dep't 1935); Matter of Kent, 146 Misc. 155, 261 N.Y.S. 698, 702 (Sur.Ct. N.Y. County 1932), aff'd, 284 N.Y.S. 976 (1st Dep't 1935).

24. Matter of Bank of New York, 35 N.Y.2d 512, 519, 364 N.Y.S.2d 164, 169, 323 N.E.2d 700 (1974); Matter of Hubbell, 302 N.Y. 246, 257, 97 N.E.2d 888 (1951); Matter of Cowles, 22 A.D.2d 365, 255 N.Y.S.2d 160, 173 (1st Dep't 1965), aff'd, 17 N.Y.2d 567, 268 N.Y.S.2d 327, 215 N.E.2d 509 (1966); Matter of Pate, 84 N.Y. S.2d 853, 866 (Sur.Ct. N.Y. County 1948), aff'd, 276 App.Div. 1008, 95 N.Y.S.2d 903 (1st Dep't 1950); Matter of Balfe, 152 Misc. 739, 274 N.Y.S. 284, 294 (Sur.Ct. Orange County 1934), aff'd, 245 App.Div. 22, 280 N.Y.S. 128 (2d Dep't 1935); Matter of McCafferty, 147 Misc. 179, 264 N.Y.S. 38, 65–66 (Sur.Ct. Kings County 1933).

existed at the time of the occurrence.[25] A distinction is made between the acts of a trustee with respect to securities received from the settlor of a trust and those purchased by the trustee. Retention of assets given by a settlor may be prudent where purchase of those assets might not, especially if a trust instrument specifically so provides.[26]

But of probably greatest relevance is the substantial body of case law uniformly rejecting the notion that the decline of a stock's market price forbids retention by a trustee of a trust's holding in that stock.[27] It is not inherently negligent for a trustee to retain stock in a period of declining market values,[28] nor is there any magic percentage of decline which, when reached, mandates sale.[29] Indeed, the market's fluctuations have expressly been rejected as a trustworthy indicia of a holding's value,—especially in times of general economic decline.[30] Similarly, the fact that a stock may not be desirable for long term investment does not mean that a trustee is under a duty to sell it at the first possible opportunity.[31]

Stripped to its bare essentials, the plaintiffs' argument is that the Trustee was negligent and imprudent in retaining these securities because of their sharp drop in market price and allegedly insufficient analysis. Case law is clear, however, that

25. *Matter of Bank of New York*, 35 N.Y.2d 512, 518–19, 364 N.Y.S.2d 164, 169, 323 N.E.2d 700 (1974); *Matter of Clark*, 257 N.Y. 132, 136, 177 N.E. 397 (1931); *Costello v. Costello*, 209 N.Y. 252, 262, 103 N.E. 148, 152, (1913) ("A wisdom developed after an event and having it and its consequences as a source, is a standard no man should be judged by."); *Purdy v. Lynch*, 145 N.Y. 462, 475–76, 40 N.E. 232 (1895); *Matter of Cowles*, 22 A.D.2d 365, 255 N.Y.S.2d 160, 173 (1st Dep't 1965), aff'd, 17 N.Y.2d 567, 268 N.Y.S.2d 327, 215 N.E.2d 509 (1966); *Matter of Pate*, 84 N.Y.S.2d 853, 858 (Sur.Ct. N.Y. County 1948), aff'd, 276 App.Div. 1008, 95 N.Y.S.2d 903 (1st Dep't 1950); *Matter of Beebe*, 52 N.Y.S.2d 736, 739 (Sur.Ct. Kings County 1943), aff'd, *City Bank Farmers Trust Co., Res.*, 268 App.Div. 1051, 52 N.Y.S.2d 796 (2d Dep't 1945); *Central Hanover Bank & Trust Co. v. Brown*, 30 N.Y.S.2d 85, 96–97 (Sup.Ct. N.Y. County 1941); *In re First Nat'l Bank*, 25 N.Y.S.2d 221, 225 (Sup.Ct. N.Y. County 1941); *Matter of Cuddeback*, 168 Misc. 698, 6 N.Y.S.2d 493, 495 (Sur.Ct. Orange County 1938); *Matter of McCafferty*, 147 Misc. 179, 264 N.Y.S. 38, 66 (Sur.Ct. Kings County 1933).

26. *Matter of Clark*, 257 N.Y. 132, 136–37, 177 N.E. 397 (1931); *Matter of Cuddeback*, 168 Misc. 698, 6 N.Y.S.2d 493, 496 (Sur.Ct. Orange County 1938); *Matter of Balfe*, 152 Misc. 739, 274 N.Y.S. 284, 289 (Sur.Ct. Orange County 1934), aff'd, 245 App.Div. 22, 280 N.Y.S. 128 (2d Dep't 1935); *Matter of McCafferty*, 147 Misc. 179, 264 N.Y.S. 38, 68 (Sur.Ct. Kings County 1933); *Matter of Kent*, 146 Misc. 155, 261 N.Y.S. 698, 702 (Sur.Ct. N.Y. County 1932), aff'd, 284 N.Y.S. 976 (1st Dep't 1935); *Matter of Winburn*, 140 Misc. 18, 249 N.Y.S. 758, 763 (Sur.Ct. Westchester County 1931).

27. *Matter of Clark*, 257 N.Y. 132, 139–40, 177 N.E. 397 (1931); *Matter of Weston*, 91 N.Y. 502, 511 (1883); *Matter of Cowles*, 22 A.D.2d 365, 255 N.Y.S.2d 160, 173 (1st Dep't 1965), aff'd, 17 N.Y.2d 567, 268 N.Y.S.2d 327, 215 N.E.2d 509 (1966); *Matter of United States Trust Co.*, 189 App.Div. 75, 178 N.Y.S. 125, 128 (2d Dep't 1919); *Matter of Morgan Guaranty Trust Co.*, 89 Misc.2d 1088, 1090, 396 N.Y.S.2d 781, 784–85 (Sur.Ct. N.Y. County 1977); *Matter of Kellogg*, 35 Misc.2d 541, 230 N.Y.S.2d 836, 845 (Sup.Ct. Erie County 1962); *Matter of Pate*, 84 N.Y.S.2d 853, 865 (Sur.Ct. N.Y. County 1948), aff'd, 276 App.Div. 1008, 95 N.Y.S.2d 903 (1st Dep't 1950); *In re First Nat'l Bank*, 25 N.Y.S.2d 221, 227–28 (Sup.Ct. N.Y. County 1941); *Matter of Cuddeback*, 168 Misc. 698, 6 N.Y.S.2d 493, 496–97 (Sur.Ct. Orange County 1938); *Matter of Balfe*, 152 Misc. 739, 274 N.Y.S. 284, 294, 295–99 (Sur.Ct. Orange County 1934), aff'd, 245 App.Div. 22, 280 N.Y.S. 128 (2d Dep't 1935); *Matter of McCafferty*, 147 Misc. 179, 264 N.Y.S. 38, 67, 70 (Sur.Ct. Kings County 1933); *Matter of Winburn*, 140 Misc. 18, 249 N.Y.S. 758, 763 (Sur.Ct. Westchester County 1931).

28. *See* cases cited in note 27 *supra*.

29. *See Matter of Clark*, 257 N.Y. 132, 139, 177 N.E. 397 (1931); *Matter of Weston*, 91 N.Y. 502, 509–10 (1883); *Matter of Balfe*, 152 Misc. 739, 274 N.Y.S. 284, 294–301 (Sur.Ct. Orange County 1934), aff'd, 245 App.Div. 22, 280 N.Y.S. 128 (2d Dep't 1935); *Matter of McCafferty*, 147 Misc. 179, 264 N.Y.S. 38, 70–71 (Sur.Ct. Kings County 1933).

30. *Matter of Cuddeback*, 168 Misc. 698, 6 N.Y.S.2d 493, 496–97 (Sur.Ct. Orange County 1938); *Matter of Winburn*, 140 Misc. 18, 249 N.Y.S. 758, 763 (Sur.Ct. Westchester County 1931).

31. *Matter of Clark*, 257 N.Y. 132, 138–39, 177 N.E. 397 (1931); *Matter of Weston*, 91 N.Y. 502, 508 (1883).

the former charge is irrelevant if the latter charge is unfounded.[32] Even putting aside for one moment the effect of the Trust instruments' authorization for retention of stocks Rousseau contributed and its exoneration of liability for so doing, under the facts of this case, the Court need not resolve the disputed issue of what standard should be applied to defendant's conduct.[33] For even if one applies the more stringent standard suggested by plaintiffs—modifying the traditional standard of a prudent person of discretion and intelligence[34] and holding the defendant as a professional trustee to a higher standard—plaintiffs' claim of inadequate attention and insufficient analysis must be rejected. The Trustee's retention decisions were the result of careful and informed deliberation; the fact that in retrospect they may have been wrong or unwise is no ground for surcharge.

## B. Application of the Law.

█ In the first place, the IPC's economic forecasts must be taken into account. This, the USTC unit charged with guiding the investment division with broad economic analyses, admittedly erred and obviously could not have foreseen certain events. The IPC's prediction that there would be no recession in 1973 or 1974, for example, placed emphasis on purchase and retention of common stocks with growth potential. There was no way, to choose another example, that the Arab oil embargo or its effects on the economy could have been expected— nations, no less than individuals did not anticipate such actions. Indeed, daily we witness instances of public officials and financial experts, specialists in the fields of

---

**32.** See cases cited in note 27 supra.

**33.** As established in King v. Talbot, 40 N.Y. 76, 85–86 (1869) and reiterated recently in Matter of Bank of New York, 35 N.Y.2d 512, 518–19, 364 N.Y.S.2d 164, 169, 323 N.E.2d 700, 704 (1974), a "trustee is [bound to employ] such diligence and such prudence in the care and management, as in general, prudent men of discretion and intelligence in such matters, employ in their own like affairs." Plaintiffs argue that any application of this standard herein must take into consideration the fact that the defendant is a professional fiduciary, and consequently, having held itself out as possessing greater knowledge and skill than the average person, must be judged by a higher standard. In support, they rely largely upon general authority and cases from other jurisdictions. E. g., Estate of Beach, 15 Cal.3d 632, 125 Cal.Rptr. 570, 542 P.2d 994 (1975); Liberty Title and Trust Co. v. Plews, 142 N.J.Eq. 493, 60 A.2d 630 (Ch. 1948), aff'd in part, rev'd in part, 6 N.J. 28, 77 A.2d 219 (1950); Estate of Killey, 457 Pa. 474, 326 A.2d 372 (1974); Restatement (Second) of Trusts § 174; 2 Scott on Trusts § 174 at 1410–13 (3d ed. 1967); Uniform Probate Code § 7–302.

The scant New York authority relied upon by plaintiffs does not directly support their contentions. Isham v. Post, 141 N.Y. 100, 104–05, 35 N.E. 1084 (1894), dealt with agency-principal relations and specifically not with the defendant's capacity therein as trustee. Matter of Clark, 136 Misc. 881, 242 N.Y.S. 210 (Sur.Ct. Westchester County 1930), aff'd, 232 App.Div. 781, 249 N.Y.S. 923 (2d Dep't), rev'd, 257 N.Y. 132, 177 N.E. 397 (1931), also cited by plaintiffs, provides them with slender support at best. The Surrogate in Clark held that a corporate trustee's conduct was measured by a standard more stringent than that applied to an individual, found a breach of that standard and assessed the corporate trustee with a surcharge. 242 N.Y.S. at 220–21. Although not referring specifically to this portion of the Surrogate's opinion, the Court of Appeals pointedly applied to the corporate trustee defendant the standard of King v. Talbot, supra, the same standard applied to individuals, 257 N.Y. at 136, 177 N.E. 397, found no breach and reversed. That this remains the standard seems implicit in the recent Court of Appeals ruling in Matter of Bank of New York, supra, where the King individual standard was again applied to a corporate trustee. 35 N.Y..2d at 518–19, 364 N.Y.S.2d at 169, 323 N.E.2d 700. Finally, two lower New York state courts have expressly rejected the argument put forward here. Matter of Flint, 240 App.Div. 217, 226, 269 N.Y.S. 470, 479 (2d Dep't 1934), aff'd, Central Hanover Bank & Trust Co., 266 N.Y. 607, 195 N.E. 221 (1935); Matter of Pate, 84 N.Y.S.2d 853, 858 (Sur.Ct. N.Y. County 1948), aff'd 276 App.Div. 1008, 95 N.Y.S.2d 903 (1st Dep't 1950). Thus, despite plaintiffs' argument to the contrary, the New York cases apparently do not distinguish between institutional and individual trustees in the standard applied to a trustee's conduct. As indicated above, however, this issue need not be determined in this case.

**34.** Matter of Bank of New York, 35 N.Y.2d 512, 518–19, 364 N.Y.S.2d 164, 169, 323 N.E.2d 700 (1974); Matter of Clark, 257 N.Y. 132, 136, 177 N.E. 397 (1931); King v. Talbot, 40 N.Y. 76, 85–86 (1869).

economics, fiscal and monetary affairs, whose forecasts of events fall far wide of eventualities. Given the breadth of information and analyses the IPC reports contain, their predictions certainly were not without a reasonable basis—which is all that is required. And these forecasts guided the portfolio managers, Loud included.

The fact that Loud did not speak to an analyst, write a note to the Clorox file that she had read a report, do her own analysis or clip articles from the Wall Street Journal is irrelevant. She testified—and in the Court's opinion truthfully—that she read the analyses and articles. Information contained therein, most of it extremely favorable to Clorox, was sufficient to support her retention decisions. And although no outside analytical reports on Clorox from March 1972 to April 1973 are in the Clorox file, the file did contain two prospectuses concerning the issuance of securities, notice of the annual shareholders meeting and a proxy statement circulated during that period. In addition, the financial press covered all developments in Clorox's acquisition program, plus published its financial reports. Loud also testified that she might well have read other analysts' reports which came out at that time. She was aware of the changes in the company and the fact that her opinions of Clorox were shared by the majority of analysts suggests that her judgment was reasonable. Plaintiffs cite no legal authority for their novel proposition that a trustee, even a professional trustee, violates its fiduciary duty unless it acts solely upon its own analyses committed to

writing,[35] and the Court refuses to so hold. The issue is whether an overall and knowledgeable judgment was brought to bear; whether the defendant's conduct under all the circumstances was prudent. The fact is that in this case, given the information available to Loud and her use of it, the defendant's conduct amply met that standard. The evidence fully sustains a finding that Loud was not only attentive to all matters pertaining to Clorox, but that she and her associate exercised a considered, informed, prudent and reasonable judgment in the discharge of their fiduciary duties.

Despite the fact that Evans was coded by the SSC and followed by an analyst, plaintiffs persistently allege that there was insufficient attention paid to the stock. Loud read the reports, communicated with the analyst regularly, followed the company in the financial press and was aware of changes in the company. The SSC and analyst considered it on numerous occasions—memoranda and other documentary evidence alone indicates more than twenty times in the three-year period. Loud reviewed the holding on an even greater number of occasions. The claim of inattention or negligence is simply unsupported. Plaintiffs' further attempt to support this allegation by observing that an HS code was repeatedly placed on Evans stock, noting that this code is by USTC policy "temporary" and thus concluding that it was imprudent to wait for projected price recovery for as long as the Trustee did, fails to account for the realities of the situation.

---

**35.** Plaintiffs' sole support for this argument is a comment contained in a "Statement of Principles of Trust Institutions" promulgated by the American Bankers Association Trust Division in 1933, which provides in part that "[a]ll investments should be made, retained or sold only upon the authority of an investment committee composed of capable and experienced officers or directors of the institution." While the argument may have some surface appeal, the Court refuses to hold this to be a mandatory practice for a professional trustee, failing which a trustee is *per se* liable for breach of fiduciary duty. As stated above, defendant's conduct with respect to Clorox was in fact prudent. Moreover, the comment upon which plaintiffs rely so heavily was recently withdrawn along with the entire Statement of Principles pending revision and updating to account for changes occurring since 1933. And in a case factually similar to this, in which a trust account was handled for a professional trustee by an individual, the New York Surrogate decisively rejected a claim of imprudence in retaining one stock during a period of sharp market decline where it was shown that the individual examined and reexamined the securities, conferred with other officers of the defendant company and sought available outside information and that decision was affirmed on appeal. *Matter of Pate*, 84 N.Y.S.2d 853, 858 (Sur.Ct. N.Y. County 1948), *aff'd*, 276 App.Div. 1008, 95 N.Y.S.2d 903 (1st Dep't 1950).

True, the USTC coding procedures manual provides that "under no circumstances [should HS] be used as a haven for compromise." But the fact that a coding is designed to be temporary does not mean that on successive occasions, an informed and deliberate SSC could not reasonably conclude that the stock's price would in fact rise, especially when it was deemed underpriced in the market. As cogently explained at trial, in a number of coded stocks during 1973–74, HS was repeatedly retained based upon USTC's economic outlook and investment strategy—it believed that the market in due course would recover and that large numbers of stocks were unduly depressed. Finally, the evidence clearly shows that the eventual recoding of Evans was prompted by a wholly unexpected announcement that earnings projections would not be met and that operations would only break even and the sale of the stock based largely on the resultant loss of Evans' dividend—both clearly reasoned decisions.

As to Coleco, plaintiffs' allegations of inattention are similarly unfounded for the same reasons described above. Again, Loud followed the company in the financial press, discussed it with the research analyst regularly, attended a shareholders' meeting and met with management. The fact that there are negative statements about the company in the SSC and analysts' reports does not mean that they had to be acted upon immediately. Indeed, their presence confirms the fact that aware of all relevant factors and bearing in mind the IPC's forecast, the judgments to retain Coleco pending price appreciation were reasoned and informed.

In sum, as stated by the New York State Court of Appeals in *Matter of Clark*,[36] a case factually similar to this:

With all the advices which the trustee received from those well versed in the . . . trade and in finance, and those experienced in the vagaries of the stock exchange, counseling delay, how can it be said that it was negligent in omitting to make prompt disposal of the stocks? Under the circumstances, we think that the trustee, as the event has proven, was guilty, at the very most, of an error of judgment, in not making sale of the stocks at an earlier date. It may have been deficient in prevision and prophesy; it was not lacking in the exercise of care.[37]

No extended discussion is warranted by plaintiffs' charge that defendant was negligent in not diversifying the Trusts' portfolios which allegedly contained too many "speculative" securities. In the first place, the allegation is factually unfounded. Originally, the Trusts each contained four times as much Evans' stock as they did at Rousseau's death—three quarters of the original Evans' holdings were sold in 1966–68 at the Trustee's insistence and over Rousseau's objections for the precise purpose of diversification.[38] Indeed, Rousseau's criticism of the handling of the account which lead to the brief hiatus in Loud's stewardship was that the portfolio was being managed too conservatively. And when Rousseau died in 1972, the portfolio was invested in such established concerns as Pepsico and IBM. Legally, the allegation is irrelevant. Under New York law, an investment must be found faulty for some reason other than the percentage of the trust it constitutes,[39] which as indicated above has not been shown.

---

**36.** 257 N.Y. 132, 177 N.E. 397 (1931).

**37.** *Id.* at 139–40, 177 N.E. at 399.

**38.** *See* note 13 *supra*.

**39.** *See Matter of Flint*, 240 App.Div. 217, 269 N.Y.S. 470, 482 (2d Dep't 1934), *aff'd, In re Central Hanover Bank & Trust Co.*, 266 N.Y. 607, 195 N.E. 221 (1935); *Matter of Kellogg*, 35 Misc.2d 541, 230 N.Y.S.2d 836, 846 (Sup.Ct. Erie County 1962); *Matter of Hadden*, 202 Misc. 1013, 111 N.Y.S.2d 112, 113 (Sur.Ct. Kings County 1952); *Matter of Pate*, 84 N.Y. S.2d 853, 863 (Sur.Ct. N.Y. County 1948), *aff'd*, 276 App.Div. 1008, 95 N.Y.S.2d 903 (1st Dep't 1950); *Matter of Beebe*, 52 N.Y.S.2d 736, 740–41 (Sur.Ct. Kings County 1943), *aff'd*, 268 App. Div. 1051, 52 N.Y.S.2d 796 (2d Dep't 1945); *In re First Nat'l Bank*, 25 N.Y.S.2d 221, 225 (Sup.Ct. N.Y. County 1941); *Matter of Adriance*, 145 Misc. 345, 352, 260 N.Y.S. 173, 180–81 (Sur.Ct. Kings County 1932).

Indeed, this analysis has thus far ignored the provisions of the Trust agreements and measured the Trustee's conduct by the standard urged by plaintiffs. However, the provisions of each agreement provide an equally cogent ground for rejecting plaintiffs' claims: they specifically authorize the Trustee in its absolute discretion to retain any property received in the Trusts regardless of whether it constitutes a disproportionate amount of a total Trust corpus and expressly provide that the Trustee will not be subject to criticism or surcharge for so doing. Similarly, each agreement provides that the "trustee shall not be held liable for loss of principal or income caused by the retention" of securities contributed by Rousseau, and that retention decisions are in the Trustee's absolute discretion. Although absolute discretion "does not mean . . . that it might be recklessly or willfully abused," [40] exoneration provisions are recognized under New York law in inter vivos trusts such as these and protect a trustee from liability absent recklessness, fraud or intentional wrongdoing.[41] There is no allegation of fraud and plaintiffs have failed to prove either negligence or imprudence in this case; manifestly they have not shown recklessness or conscious wrongdoing. There is simply no factual basis which would justify a disregard of the settlor's express provisions.

In sum, with respect to each Trust, it has not been established that any losses resulted from imprudence or negligence. To the contrary, the evidence abundantly establishes that deliberate, informed and experienced attention and professional judgment were brought into play with respect to each decision that was made at the time of decision.

The foregoing shall constitute the Court's Findings of Fact and Conclusions of Law.

**40.** *Carrier v. Carrier,* 226 N.Y. 114, 125, 123 N.E. 135 (1919) (Cardozo, J.).

**41.** *Crabb v. Young,* 92 N.Y. 56, 66 (1883); *Matter of Cowles,* 22 A.D.2d 365, 255 N.Y.S.2d 160, 174 (1st Dep't 1965), *aff'd,* 17 N.Y.2d 567, 268 N.Y.S.2d 327, 215 N.E.2d 509 (1966); *Matter of Winburn,* 140 Misc. 18, 249 N.Y.S. 758, 762 (Sur.Ct. Westchester County 1931); *see Mor-*

Judgment is granted on the merits for the defendant and may be entered accordingly.

*rissey v. Curran,* 351 F.Supp. 775, 782–83 (S.D. N.Y.1972), *aff'd,* 483 F.2d 480 (2d Cir. 1973), *cert. denied,* 414 U.S. 1128, 94 S.Ct. 865, 38 L.Ed.2d 752 (1974). *But see* N.Y.E.P.T.L. § 11–1.7(a)(1) (McKinney 1967) (exoneration provisions contrary to public policy in testamentary trusts).